446 F.2d 394
 Earline WHISENANT, individually and as tutrix of her minor
children, Sheila Dianne Whisenant, et al., Plaintiffs,
v.
BREWSTER-BARTLE OFFSHORE COMPANY et al.,
Defendants-Appellees, v. LOOMIS HYDRAULIC TESTING
CO., Inc., et al., Third Party
Defendants-Appellants.
 No. 31020.
 United States Court of Appeals, Fifth Circuit.
 July 20, 1971, Rehearing and Rehearing En Banc Denied Sept. 29, 1971.
 
 Thomas W. Thorne, Jr., New Orleans, La., Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for appellants.
 Philip E. Henderson, of O'Neal, Henderson, Hanemann & Morris, Houma, La., for appellees.
 Before GEWIN, BELL and MORGAN, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 This multiparty maritime suit arose out of an accident which killed an employee of an independent contractor while he was engaged in specialized testing of an oil well drill aboard a submersible drilling barge. In the aftermath the decedent's widow and minor children (heirs) sued the barge owner; the barge owner sued the decedent's employer; and the decedent's compensation insurer intervened for benefits paid. Following a settlement between the decedent's heirs and the barge owner, the district court granted the barge owner Ryan[1] indemnification over against the decedent's employer, and denied the compensation insurer's claim for intervention. The employer and the compensation insurer appeal. While we do not disagree with all of the findings of the trial court, we do conclude that we must reverse and remand for the reasons hereinafter stated.[2]
 
 I. Facts
 
 2
 Ray Whisenant, an employee of Loomis Hydraulic Testing Co., Inc. (Loomis), was crushed to death while working on a submersible drilling barge (vessel) owned by Brewster-Bartle Offshore Company (Brewster-Bartle). At the time of the accident the drilling barge was drilling an oil well off the coast of Louisiana pursuant to a contract with Texaco Inc. (Texaco). Texaco, in turn, had contracted with Loomis to perform certain specialized testing services on the drill pipe being used in the drilling of the well. The contract stipulated that the testing would be performed while the pipe was on board the drilling barge. No privity of contract existed between Loomis and Brewster-Bartle.
 
 
 3
 On the evening of September 7, 1964, Loomis sent a two-man testing team, along with the necessary testing equipment, to perform the test; Ray Whisenant was the 'operator' of the team, and his brother-in-law, W. A. Russ, was his helper. They commenced their work at approximately 1:00 a.m. on the morning of September 8, 1964.
 
 
 4
 Loomis' testing procedure called for a small sheave or pulley to be hung at the top of the derrick so that a small cable (wireline) could be run through it. One end of the wireline would then be attached to a winch operated on the ground by a loomis employee and the other end would be attached to the testing tool which would be lowered into the drill pipe as it stood upright in the derrick.
 
 
 5
 As is customary when a specialized crew comes aboard a rig, the 'operator' of the crew, here Whisenant, discussed his proposed plan of procedure with the rig personnel before commencing to work.[3] Whisenant then met with Athos Danos, the Brewster-Bartle driller, to discuss how the pulley, which was too heavy for one man to carry, was to be secured at the top of the derrick. After some discussion Whisenant told Danos that he was going to tie the pulley to the top of the traveling block[4] and have Danos raise the block to the top of the derrick by means of the rig's drawwork (a large winch). Whisenant advised Danos that he himself planned to ride the derrick's elevator up to the monkey board (platform) and then climb the ladder on the outside of the derrick to a point below the crown of the derrick. From that point Whisenant planned to give Danos a hand signal for him to raise the traveling block upward by op-erating the drawworks from below until it reached a point four or five feet from the bottom of the sills at the top of the derrick. At that point Whisenant intended to give Danos a second hand signal to stop the upward movement of the block. Once the traveling block stopped, Whisenant planned to step out on the top of the block, using the top of the block as a work platform, and hang the pulley from the crown of the derrick.[5] Danos approved the plan of procedure suggested by Whisenant and testified that he saw nothing inherently unsafe about the mode of operation; he did, however, offer to send one of his crew members up with Whisenant to assist him but Whisenant indicated that this would not be necessary.
 
 
 6
 In accordance with his plan Whisenant chained the pulley to the top of the traveling block and climbed the ladder to the top girder directly below the crown. Next he stepped from the ladder to the girder, and after positioning himself firmly, signalled Danos to raise the traveling block. Upon seeing the signal to raise the traveling block Danos released the brake and the clutch on the drawworks fixing it in 'idle' speed so that the traveling block began moving slowly upward. After the traveling block began to rise Danos looked for, but did not see, any further hand signal indicating that he should stop the motion of the traveling block. As a consequence, the traveling block struck the sill at the top of the derrick; Whisenant, who had jumped onto the top of the traveling block unseen by Danos was crushed.
 
 
 7
 Following the accident the decedent's widow (acting individually and as Tutrix of her minor children) filed this suit on September 1, 1965, against the barge owner, Brewster-Bartle, and Texaco alleging that Whisenant's death was caused by their negligence. Before answer was filed Employers National Insurance Company, Loomis' compensation insurer, intervened claiming sums expended for funeral expenses and death benefits paid under the Louisiana Workmen's Compensation Act. Shortly there-after on August 9, 1967, Brewster-Bartle filed a third party complaint against Loomis. On June 3, 1968, Brewster-Bartle settled the cause of action brought against it by the Whisenant heirs for the sum of $22,500 net to the heirs over and above compensation payments made, and the suit was dismissed. Brewster-Bartle did not notify Loomis or Employers National, the compensation carrier, of the settlement negotiations; nor did it tender to either for approval the proposed settlement agreement or offer Loomis the defense of the suit.[6] After the settlement was concluded, the Whisenant heirs moved the district court to dismiss their claim against Brewster-Bartle. Accordingly, their claim was dismissed but the claim of the intervenor as well as the third party claim against Loomis were reserved. Thereafter on July 5, 1968, Brewster-Bartle filed a supplemental and amended third-party complaint against Loomis for indemnification.
 
 
 8
 After hearing the case without a jury the district court rendered findings of fact and conclusions of law denying the claim of Employers National for intervention and granting Brewster-Bartle indemnity over against Loomis, plus attorney's fees and costs. In support of its conclusions the trial court found that the procedure used by Loomis to attach the pulley was unsafe and that it was this procedure which proximately caused the accident.[7] The court also found that Whisenant's action in stepping on the block while it was in motion amounted to contributory negligence on Whisenant's part and was likewise a proximate cause of the accident.[8] And finally, the court rejected the contention that the conduct of Brewster-Bartle's driller (Danos) was a proximate cause of the accident.[9] Instead the court reached the following conclusion:
 
 
 9
 The unsafe method of procedure devised and executed by Loomis' employee Whisenant, and the decedent's contributory negligence set the sequence for the resultant accident and the shipowner's negligence through Danos, if any, could not possibly have converted Loomis' ill conceived and unsafe method of operation into a safe and sound method of operation. The warranty of workmanlike or seaworthy performance was already well breached by Loomis without regard to the latter fault of Danos, if any.
 
 
 10
 Thus, the court concluded that since Loomis' breach of its implied warranty of workmanlike service proximately caused the accident and thereby rendered Brewster-Bartle's vessel unseaworthy, Brewster-Bartle should be indemnified by Loomis pursuant to the Ryan[10] doctrine.
 
 II. Ryan Doctrine
 
 11
 On appeal Loomis argues that the district court erred in failing to grant its motion to dismiss Brewster-Bartle's third party complaint. Loomis' first contention is based on the general proposition that the District Court should not have applied the Ryan doctrine of indemnification to the facts of this case. It insists that Ryan should not be extended beyond the traditional stevedore-vessel relationship to a situation in which a specialized service company comes aboard a drilling vessel and renders it unseaworthy. It is urgently insisted that there must be privity of contract between Brewster-Bartle and Loomis. We disagree with these contentions and agree with the trial court's reasoning on this phase of the case.
 
 
 12
 In Ryan Stevedoring Co. v. Pan Atlantic Steamship Co.[11] the Supreme Court allowed a shipowner to maintain an action for indemnity against the employer of injured persons who were temporarily aboard the vessel to do the work of seamen and whose injuries arose out of unseaworthiness created by their employer. The Court said that even in the absence of an express agreement of indemnity, a contractor entering into a service agreement with a shipowner was obligated to reimburse the shipowner for foreseeable damages resulting from the contractor's failure to perform its services in a workmanlike manner. The theory behind the warranty of workmanlike service and the duty of indemnification owed by the contractor has been expressed often.[12] These cases emphasize that the Ryan doctrine was carefully conceived as an admiralty concept to serve special problems in maritime law arising from the absolute and nondelegable duty of seaworthiness imposed by the general maritime law upon all vessel owners. Thus, in Italia Societa v. Oregon Stevedoring Co.[13] the Supreme Court underscored the rationale behind the Ryan doctrine with the following statement:
 
 
 13
 We deal here with a suit for indemnification based upon a maritime contract * * * in an area where rather special rules governing the obligations and liability of shipholders prevail, rules that are designed to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents. By placing the burden ultimately on the company whose default caused the injury, Reed v. The S.S. Yaka, 373 U.S. 410, 414, 83 S.Ct. 1349, 10 L.Ed.2d 448, 452, we think our decision today is in furtherance of these objectives.[14]
 
 
 14
 While not denying the equitable spirit behind the Ryan doctrine, Loomis nevertheless emphasizes this court's past reluctance to expand the doctrine beyond its original factual setting.[15] In Loffland Brothers Co. v. Roberts[16] we stated
 
 
 15
 Recognizing this unique obligation on the part of a shipowner, we have held that the Ryan doctrine is closely tied to a vessel and this obligation which the shipowner owes to those employed on the vessel. * * * We are accordingly extremely hesitant to extend the burdensome Ryan doctrine to situations not substantially similar to those which gave birth to the doctrine.
 
 
 16
 Notwithstanding these general admonitions we are convinced that the doctrine was properly analyzed in this case.[17] The court found that (1) in contracting to perform services beneficial to the vessel, Loomis warranted to perform in a workmanlike manner; (2) Loomis' unsafe procedure and plan for 'rigging up' the vessel rendered it unseaworthy and proximately caused Whisenant's death; (3) in rendering the vessel unseaworthy Loomis breached its implied warranty of workmanlike services and was therefore obligated under Ryan to indemnify the barge owner for any damages sustained as a result. Thus, given the implied warranty of workmanlike service owed by the special contractor (Loomis) to the drilling barge, we fail to see, on the facts now before us, any reason to treat the scope and measure of recovery for its breach in a manner conceptually different from that applied to the warranty of workmanlike performance owed by the stevedore to the vessel owner in Ryan[18] and Crumady v. Joachim Hendrik Fisser.[19] Both the submersible barge owner (Brewster-Bartle) in the case at hand and the vessel owner in Ryan relinquished control of their vessel to the tortfeasor;[20] yet in each case they remained absolutely liable for the condition of their vessel under the nondelegable duty to provide a seaworthy vessel. In both cases, therefore, we think it appropriate that the party whose fault caused the injury should be held responsible to indemnify the party compelled to pay an injured claimant because of its technical or vicarious liability.[21]
 
 
 17
 Loomis' second contention, related to the first but more specific, is that the absence of a contractual relationship between Loomis and Brewster-Bartle[22] should have been fatal to Brewster-Bartle's Ryan claim of indemnification against Loomis since the warranty of workmanlike performance does not extend to the vessel owner when there is no privity of contract between the vessel owner and the company performing the services. In maintaining that it is under no obligation to indemnify Brewster-Bartle, Loomis argues that it was not a party to Brewster-Bartle's agreement with Texaco, and that Brewster-Bartle was not a third party beneficiary of the Loomis-Texaco contract. This argument, however, rests on a misunderstanding of the nature of the obligation to indemnify and totally ignores the Supreme Court holding in Crumady v. Joachim Hendrik Fisser.[23] The basis of the obligation is an implied warranty of workmanlike service.[24] Moreover, the obligations which arise from the implied warranty are not limited to the confines of the usual action on contract; the zone of responsibility may extend to parties who are not in direct contractual relationship. In Crumady, the Supreme Court settled this precise question:
 
 
 18
 The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. That is enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries.[25]
 
 III. Failure to Tender Settlement Agreement
 
 19
 Appellant Loomis contends that the district court erred in awarding Brewster-Bartle indemnity for its settlement with the Whisenant heirs in the absence of evidence that Brewster-Bartle tendered the proposed settlement to Loomis for approval or negotiation, or offered it the opportunity to defend the action. We tend to agree. In Tankrederiet Gefion A/S v. Hyman-Michaels Company,[26] a case involving principles of indemnity[27] similar to those under consideration here, the indemnitee (the original defendants) settled the claim of the original plaintiffs without first tendering the settlement for approval or offering the defense in exchange for a hold harmless agreement. In these circumstances the court ruled that the settling indemnitee must prove actual liability in order to recover from the indemnitor. In a carefully reasoned opinion, the Sixth Circuit distinguished the facts of its case[28] from cases in which (1) the original defendant's claim for indemnification was founded on a judgment, or (2) the indemnitor was tendered the defense and refused it, or (3) the indemnitee's claim against the indemnitor was founded upon a written contract. In addition, the court recognized the principle that the law encourages settlements, but reasoned that
 
 
 20
 A tender of the defense in exchange for a hold-harmless agreement is a feasible protection for the party desiring to settle, as well as for the proposed indemnitor. It certainly seems appropriate for B, the party desiring to settle and possessing the facts pertaining to the settlement, to be required to tender C the choice of approving the settlement or of going forward with the defense in exchange for a hold-harmless agreement. We assume that such a hold-harmless agreement would constitute C's financially responsible guarantee that B would under no circumstances be forced to pay more than the sum for which it was prepared to settle. If such a tender were refused and B settled, then we think the proofs required in the subsequent suit against C would appropriately be potential liability and reasonableness of the settlement.
 
 
 21
 The ultimate problem with any other rule than that which the District Judge laid down here is that potentially it would allow B (the original defendants) to spend C's (the third party defendant) money without the final judgment of a court or C's agreement. Deciding whether to try a case to judgment or to settle it involves elements of legal evaluation, of financial capacity to take risk, and of appetite for court room conflict which vary widely among litigants. We hold that under the facts of this case B cannot compel C to accept B's evaluation of these critical factors. Any other rule would deny C any opportunity to contest B's liability to A-- a liability which C may be required to pay.[29]
 
 
 22
 In settling with the heirs of Whisenant without giving notice to Loomis or Employers National, Brewster-Bartle denied them the opportunity to participate in the settlement negotiations or to defend against Brewster-Bartle's primary liability. That Loomis would have chosen to contest Whisenant's claim against Brewster-Bartle is strongly suggested by the record. Immediately after settlement Brewster-Bartle amended its third party complaint against Loomis to allege for the first time that Loomis rendered the barge unseaworthy by its negligence. At the trial, counsel for Loomis complained of this fact and asserted that prior to the time of the settlement there had been no claim that the vessel was unseaworthy or that Loomis had done anything to make it so.[30] The claim against Brewster-Bartle at the time of the settlement was purely and simply a claim for negligence. Otherwise stated, as the record show, it was admitted by all that the settlement between Whisenant and Brewster-Bartle was not 'a seaman's settlement' based on elements of maritime liability; nevertheless, in its amended complaint Brewster-Bartle sought indemnification on a maritime theory (the Ryan doctrine) the elements of which had never been demonstrated because of the settlement.[31] We conclude, therefore, that under these facts and in the circumstances of this case, the finding of the trial court that the settlement between Brewster-Bartle and Whisenant was reasonable is not sufficient to support a judgment against Loomis since defense of the Whisenant claim was not tendered to it and Loomis was not given the opportunity to review, pass upon, or participate in the settlement itself. Thus, we expressly pretermit any holding on this issue and remand this phase of the case with directions that the court require Brewster-Bartle (1) to establish actual liability to Whisenant;[32] (2) to show the reasonableness of the settlement; and (3) to demonstrate that Loomis was in no way prejudiced by Brewster-Bartle's failure to either inform them of the settlement negotiations, or to tender them the defense before final settlement. We are in accord with the following succinct statement of the court in Jennings v. United States:
 
 
 23
 The indemnitee's unilateral acts, albeit reasonable and undertaken in good faith, cannot bind the indemnitor; notice and an opportunity to defend are the indispensable due process satisfying elements.[33]
 
 IV. Insurance Carrier's Intervention
 
 24
 As a final contention appellants argue that the court erred in denying Employers National complaint of intervention by which it sought to recover money paid to Whisenant's estate under the Louisiana Workman's Compensation Act. The district court denied this claim without explanation or supporting citation.[34] Our reading of the cases pertinent to this claim[35] indicates that the workman's compensation insurance carrier may have a valid subrogation claim under the facts presented.[36] Accordingly, we must remand for a full determination of this question. On remand the trial court should determine whether Employers National is entitled to subrogation for the medical and funeral expenses paid as well as for attorney fees incurred in the litigation; and if not, reasons for such denial should be given.
 
 
 25
 Reversed and remanded for further proceedings not inconsistent with this opinion.[37]
 
 
 26
 ON PETITIONS FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 27
 The Petition for Rehearing filed by Loomis Hydraulic Testing Co., Inc. and Employers National Insurance Company, Appellants, is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 28
 The Petition for Rehearing filed by Brewster-Bartle Offshore Company et al., Appellees in the above numbered and captioned case is also hereby denied.
 
 
 
 [1]
 Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)
 
 
 [2]
 The decision of the lower court is reported in D.C., 319 F.Supp. 993 (1970)
 
 
 [3]
 The lower court found that while a specialist crew is 'rigging up' its testing equipment, it is customary for the drilling crew not to work in the derrick floor area except for those members of the crew who are requested by the specialized crew to assist them in rigging up the testing equipment
 It is also customary when specialized service teams come aboard a drilling rig, for the drilling crew to offer such members of its personnel and such equipment as is needed by the specialized team to assist in performing its service. Furthermore, the company (Texaco) that hires the drilling company (Brewster-Bartle) and hires the specialized service company (Loomis) expects the specialized service company to make use of the drilling crew to assist in the performance of the specialized service and expects, as part of the contractual undertaking, for the drilling company to allow its men to be used by the specialized company. These findings are not clearly erroneous.
 
 
 [4]
 The traveling block is a heavy metal object through which cables run; the block is pulled up and down in the derrick with the raising and lowering of drill pipes. The 'block' is flat on two sides, but the top of the block forms a curved half-moon surface which slopes from top to bottom at about 30 degrees to 45 degrees degree angle. Since no flat area exists on top of the block, anyone standing on the block would have to position his feet on this curface approximately two feet in width
 
 
 [5]
 The derrick is one of the type that is commonly used in the oil industry in south Louisiana; there was nothing abnormal or unusual about it. The distance from the rig floor to the crown was 142 feet. The top of the rig was illuminated by several lights
 
 
 [6]
 The record demonstrates that the settlement between Brewster-Bartle and the Whisenant heirs was not concluded in the United States District Court which heard this case. The settlement was approved by a Louisiana state court in the parish where the minor children of Whisenant resided
 
 
 [7]
 The normal and usual procedure for hanging the pulley was to have it brought up on either the 'fast' line (one of the single cables operated by the driller's drawworks) or by the 'cat' line (an additional line or cable available in the derrick.)
 To bring the pulley up the derrick by means of the traveling block was found to be highly unusual. In the ordinary course of operations, the driller would only rarely taise the block nearer than 20-30 feet from the crown. Because of the inward lean of the derrick sides (the base of the derrick being much broader across on all sides than the top), and the width of the traveling block, it was extremely difficult for the driller to judge distances at the top of the derrick. Moreover, from the rig floor the driller could see Whisenant's hand only when Whisenant reached into the interior tunnel of the derrick; when Whisenant resumed his normal standing position after having leaned forward to give the signal to raise the block, the driller could not see him. Of course, darkness compounded these difficulties.
 
 
 [8]
 Whisenant's use of the sloping top of the traveling block as a work platform was highly unusual and abnormal. Mr. Huey Hoffpauir, Loomis' supervisor in charge of Whisenant, testified that in the thirteen years he had been employed by Loomis, he had never worked from on top of the block and that he considered it dangerous to do so. A. W. Russ, Whisenant's helper on the job, was instructed by Whisenant himself never to get on top of the block
 
 
 [9]
 The court ruled as follows:
 Whether under the circumstances, it was unreasonable for Danos to have failed to see a hand signal if one was given and a leap or step by a man across a twenty-two inch opening at a distance of approximately 135 to 140 feet, need not be decided because if such was negligence, such negligence would not preclude indemnity.
 
 
 [10]
 Ryan Stevedoring Co. v. Pan Atlantic Steamship Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)
 
 
 [11]
 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)
 
 
 [12]
 Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Waterman Steamship Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Weyerhaeuser Steamship Co. v. Nacirema Operating Company, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011 (5th Cir. 1969); cert. dismissed Fidelity & Cas. Co. v. Grigsby, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; Loffland Brothers Co. v. Roberts, 5 Cir., 386 F.2d 540, cert. denied 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830; Lusich v. Bloomfield Steamship Co., 355 F.2d 770 (5th Cir. 1966). Bue, Admiralty Law in the Fifth Circuit-- A Compendium for Practitioners I, 4 Houston L.Rev. 347, 408 (1966)
 
 
 [13]
 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964)
 
 
 [14]
 376 U.S. 324, 84 S.Ct. 754, 11 L.Ed.2d 741
 
 
 [15]
 See Hobart v. Sohio Petroleum Co., 445 F.2d 435 (5th Cir. 1971); Smith Petroleum Service, Inc. v. Monsanto Chemical Co., 420 F.2d 1103 (5th Cir. 1970); Loffland Brothers Co. v. Roberts, 386 F.2d 540, 549 (5th Cir. 1967); Centraal Stikstof Verkoopkanter, N.V. v. Walsh Stevedoring Co., 380 F.2d 523, 529 (5th Cir. 1967)
 
 
 [16]
 386 F.2d 540, 549 (5th Cir. 1967)
 
 
 [17]
 In those sections pertinent the district court analyzed Ryan in its conclusions of law as follows:
 
 
 [3]
 The Ryan case involved a stevedore. Though there is no stevedoring company involved in this case, the theory is the same. A party contracting to perform services beneficial to the vessel owes the vessel owner a duty to perform in a workmanlike manner so as not to render the vessel unseaworthy * * * The cases cited by Loomis, Humble Oil & Refining Company v. Naquin, (5 Cir.) 414 F.2d 912; Tri-State Oil (Tool) Industries, Inc. v. Delta Marine Drilling Company, (5 Cir.) 410 F.2d 178 and Halliburton Company v. Norton Drilling Company, (5 Cir.) 302 F.2d 431, in support of its contention that the Ryan doctrine should not apply are inapposite and clearly distinguishable * * * 6. Loomis held itself out to be an expert in its testing procedures which necessarily included its rigging up procedures; Loomis was clearly in charge of outlining the method of procedures by which it was to rig its testing equipment; the unsafe procedure and plan of rigging up rendered the drilling barge unseaworthy and constituted a breach of implied warranty owed by Loomis to the vessel owner under the doctrine announced in Ryan Stevedoring Co. v. Pan Atlantic Steamship Co., 350 U.S. (124) 141, 76 S.Ct. 632 (232)
 
 
 [18]
 350 U.S. 141, 76 S.Ct. 232, 100 L.Ed. 133
 
 
 [19]
 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413
 
 
 [20]
 The trial court specifically found that Loomis was clearly in charge of the procedure followed and that during the testing the only members of the vessel's crew in the area of the derrick were those who were instructed to assist the operation by the Loomis crew. This finding is not clearly erroneous
 
 
 [21]
 See Tri-State Oil Tool Indus., Inc. v. Delta Marine Co., 410 F.2d 178, 181 (5th Cir. 1969); General Electric Co. v. Cuban American Nickel Co., 396 F.2d 89, 91-92 (5th Cir. 1968)
 
 
 [22]
 Loomis' contract for the performance of its services aboard Brewster-Bartle's barge was with Texaco
 
 
 [23]
 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). See also Waterman Steamship Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); DeGioia v. United States Lines Co., 304 F.2d 421 (2d Cir. 1962)
 
 
 [24]
 Id. See Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310, 312-313 (2d Cir. 1958)
 
 
 [25]
 358 U.S. 428, 79 S.Ct. 448, 3 L.Ed.2d 417
 
 
 [26]
 406 F.2d 1039 (6th Cir. 1969)
 
 
 [27]
 We do not agree with Brewster-Bartle that fundamental principles of indemnity should not be considered in a Ryan situation. While technical rules of tort indemnity may not apply in a given case, the basic principles of due process and fair treatment of the indemnitee should be considered
 
 
 [28]
 In Tankrederict, the indemnitor had full knowledge of the litigation since it was impleaded as a party; and in addition it knew that settlement negotiations were going on since it was invited to participate. In the case under consideration, Loomis had knowledge of the pending litigation between Whisenant and Brewster-Bartle but was not afforded an opportunity to participate in settlement negotiations. In Tankrederiet, however, the crucial factor in the court's decision appears to be that the settlement agreement was not tendered to the indemnitor. Here it is undisputed that Loomis was never tendered the settlement agreement in any form or fashion or offered the defense of the case
 
 
 [29]
 406 F.2d 1039, 1043-1044. In addition see Jennings v. United States, 374 F.2d 983 (4th Cir. 1967); Chicago, R.I. & P.R. Co. v. Dobry Flour Mills, 211 F.2d 785, 787-788 (10th Cir. 1954); Johnson v. Excelsior Shipping Company, 319 F.Supp. 986, 989 (S.D.Ala.1970); Skibs A/S Gylfe v. Hyman Michaels Company, 304 F.Supp. 1204, 1206 (E.D.Mich.1969)
 
 
 [30]
 In arguing to the court, Mr. Thorne, attorney for Loomis, raised the point that there had never been a claim of the unseaworthiness of Brewster-Bartle's vessel during the litigation or settlement between the Whisenant heirs and Brewster-Bartle. Following thest remarks the record discloses some ambivalence on the court's part with respect to the settlement proceedings. The settlement between Brewster-Bartle and the Whisenants was based on a simple negligence claim. On the other hand, the subsequent amended complaint of Brewster-Bartle against Loomis filed after settlement, introduced the question of 'unseaworthiness.' After stating that the nature of Whisenant's complaint against Brewster-Bartle was of no importance, the court nevertheless stated:
 But, I think that there is some infirmity in this whole thing, because Brewster-Bartle, this morning, is going to prove unseaworthiness as against Loomis-- not unseaworthiness, try to prove that they caused this unseaworthy condition to be created.
 
 
 [31]
 In any application of the Ryan doctrine, it would appear that at least the following three elements must be present: (a) a vessel must be found to be unseaworthy, (b) the implied agreement or warranty of workmanlike performance must be breached, and (c) the injured party must have been a seaman of some type. In this case there were findings of fact and conclusions of law that the vessel involved was unseaworthy and that there was a breach of the warranty of workmanlike performance. Only by implication was there a finding that Whisenant was a seaman, vicarious or otherwise, at the time he came to his death. We are aware of the fact that such a finding appears to be implicit in the conclusion that the Ryan doctrine applies. Nevertheless, because the determination of Whisenant's status as a seaman is of critical importance in ascertaining whether the warranty of seaworthiness embraced him, we believe it is far more preferable for this question to be specifically resolved by the trial court. Accordingly, on remand the trial court should require a careful, full and complete development of the facts necessary to support a conclusion that Whisenant was a seaman or vicarious seaman. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). See also Jackson v. Lykes Bros. Steamship Co., Inc. 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967) (note 4); Williams v. Ocean Transport Lines, Inc., 425 F.2d 1183 (3d Cir. 1970); Harney v. William M. Moore Building Corp., 359 F.2d 649, 655 (2d Cir. 1966); Hebert v. California Oil Co., 280 F.Supp. 754 (W.D.La.1967); Creel v. Drill Tender Jack Cleverly, 264 F.Supp. 98, 101 (W.D.La.1966)
 
 
 [32]
 Our holding on the issue of establishing actual liability is limited to the facts and circumstances here under consideration, as indicated above. We recognize that a determination that a settlement is reasonable, without proof of actual liability, may be justified in other situations. See, e.g., Underwater Services, Inc. v. Brown & Root Marine Operators, 376 F.2d 852 5th Cir. 1967), aff'g Smith v. Brown & Root Marine Operators, Inc., 243 F.Supp. 130 (W.D.La.1965); Strachan Shipping Co. v. Koninklyke Nederlandsche S.M., N.V., 324 F.2d 746 (5th Cir. 1963), cert. denied 376 U.S. 954, 84 S.Ct. 969, 11 L.Ed.2d 972; Damanti v. A/S Inger, 314 F.2d 395 (2d Cir. 1963), cert. denied, Daniels & Kennedy Inc. v. A/S Inger, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64; Rederi A/B Dalen v. Maher, 303 F.2d 565 (4th Cir. 1962); Johnson v. Excelsior Shipping Co., 319 F.Supp. 986, 989 (S.D.Ala.1970)
 
 
 [33]
 374 F.2d 983 at 986
 
 
 [34]
 In its Conclusion of Law, the district judge rejected this claim with the following terse statement:
 
 
 [12]
 Employer's National claim for intervention must be denied, and Brewster-Bartle's claim for indemnity under the Ryan doctrine be granted
 We are unable to reconcile this legal conclusion, reached without explanation or supporting citation, with the following relevant factual findings of the court:
 
 
 [30]
 Employer's National Insurance Company, as the compensation insurer of Loomis under the Compensation Act, paid death benefits and funeral expenses totaling $7,390.00 to Earline Whisenant, individually and as tutrix of her and Ray Whisenant's minor children, Sheila Dianne Whisenant, Michael Earl Whisenant and Rebecca Lynn Whisenant. 33. Employer's National Insurance Company was not included in the above referred to settlement and received no portion of the funds; the settlement was made without the consent of Employers' National Insurance Company. The court made no other findings on this issue
 
 
 [35]
 For Federal cases relevant to this see Russo v. Flota Mercante Grancolombiana, 303 F.Supp. 1404, 1406 (S.D.N.Y.1969); Callaghan v. Eastern Air Lines, Inc., 286 F.Supp. 8, 9 (E.D.Va.1968)
 For Louisiana cases see Hanford v. Delta Steamship Lines, Inc., 232 So.2d 818, 821 (La.Ct.App.1970); Hanford v. Jan. C. Uiterwyk Company, 214 So.2d 236, 241-242 (La.Ct.App.1968); Lege v. United States Fidelity & Guaranty Co., 186 So.2d 670, 672 (La.Ct.App.1966).
 
 
 [36]
 We do not speculate on the practical effect upon the other parties involved if the asserted claim of Employers National is allowed
 
 
 [37]
 We have considered all issues raised by the parties but have decided only those deemed substantial or appropriate to be decided in view of our determination to remand