**Arthur H. MATHIESEN, as owner of the M/S BETTINA, Plaintiff,**

v.

**PANAMA CANAL COMPANY.**

**Civ. No. 7179.**

District Court, Canal Zone, Division Balboa.

Feb. 20, 1975.

De Castro & Robles, Balboa, Canal Zone, (Richard G. Ashworth, New York City, of counsel), for plaintiff.

Haines, McKabney & McMillin, Gen. Counsel, Balboa Heights, Canal Zone, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CROWE, District Judge.

This action in personam was filed by the plaintiff, Arthur H. Mathiesen, as owner of the M/S BETTINA against the defendant, The Panama Canal Company on May 5, 1972 almost three years after the date of the accident on May 16, 1968. The collision between the M/S BETTINA and the M/S GABONKUST occurred at about 0630 hours and thereafter on the same day the Board of Local Inspectors convened at 1340 and conducted an inquiry into the circumstances surrounding the collision.

The inquiry was conducted in accordance with 2 C.Z.C. § 297 and consisted of three experienced navigators employed by the Panama Canal Company. The BETTINA, the GABONKUST, the Panama Canal Company and the pilot on the BETTINA, Captain K. L. Bivin were represented by counsel and testimony was taken of the masters of the two vessels, the pilot and additional witnesses. The Board made detailed findings of fact and rendered an opinon that there was fault on the part of the master of the GABONKUST and fault on the part of the Panama Canal Company pilot on the BETTINA but no fault on the part of the BETTINA, her master or crew.

The BETTINA and the GABONKUST were repaired and returned to Europe where litigation ensued in the courts of Holland and a settlement was ultimately reached. The defendant did not participate in the litigation nor the settlement negotiations and disclaimed any liability in the matter in spite of the findings and opinion of its Board of Inspectors that there was fault on the part of its pilot.

It is the decision of this court that the BETTINA should be made whole as near as is reasonable and with that in view it makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Defendant, Panama Canal Company, was at all times mentioned in the complaint and answer, and still is, a corporate agency and instrumentality of the United States of America. The charter provisions of the Panama Canal Company appear in sections 61 through 75 and 121 through 123 of Title 2, Canal Zone Code, 76A Stat. 8–15.

2. Plaintiff, Arthur H. Mathiesen, was at all times mentioned in the complaint and answer, the owner of the motorship BETTINA, a Norwegian-flag, steel-hulled, single-screw bulk carrier of 716' – 11" in length and 102' - 02" in beam with a diesel engine of approximately 12,600 horsepower.

3. GABONKUST was on the day of the collision a Dutch-flag, steel-hulled, single-screw general cargo vessel of 388' - 07" in length and 51' - 03" in beam with a diesel engine of approximately 3,300 brake horsepower. On the day of the collision GABONKUST was owned by N. V. Stoomvaart Maatschappij Nederland.

4. On May 16, 1968, BETTINA was lying to her anchor in the Pacific Anchorage of the Panama Canal prior to beginning a northbound transit at about 08° - 51' - 52" North latitude and 79° - 29' - 20" West longitude. The vessel was on an even keel, her draft being 36' - 07" fore and aft.

5. At approximately 0545 hours BETTINA was boarded by Panama Canal

Pilots K. L. Biven and R. J. Wesley. These pilots were assigned to the vessel in accordance with the provisions of Title 35, Code of Federal Regulations, §§ 105.1 and 105.6 to take the vessel through the Canal. Pilot Bivin was a fully qualified Panama Canal pilot having served as a pilot for 14 years and 9 months and in addition, was the holder of a master's license, oceans, issued by the United States Coast Guard. The master of BETTINA was Paul Harefjord.

6. GABONKUST on the morning of May 16, 1968 was completing a southbound transit of the Panama Canal. The vessel passed beneath the Thatcher Ferry Bridge at about 0543 hours and the engine was ordered full ahead. Panama Canal pilot who transited GABONKUST was M. J. Tyler; the master of GABONKUST was Jan Yntema. The draft of the vessel was 9' - 03" forward, 16'- 00" aft.

7. GABONKUST left the Pacific Entrance Channel by passing between buoys # 4 and # 2 at about 0607 hours. GABONKUST's engine was ordered from full ahead to dead slow ahead at 0606 hours and then to stop at 0608 hours. At this time, the pilot ordered GABONKUST to steer east by south (099°). At about 0610 hours, Pilot Tyler disembarked from GABONKUST. Therefore, Yntema had the vessel's conn from some time prior to 0610 hours until the time of the collision. Following the disembarkation of the pilot, Captain Yntema had the GABONKUST change course to east (090°). With Captain Yntema on the bridge of GABONKUST was the vessel's second officer, J. Konink, and the quartermaster at the wheel, J. J. H. F. Iske.

8. At 0610 hours BETTINA got underway and Pilot K. L. Bivin was conning the vessel. With Pilot Bivin on the bridge of BETTINA was her master, Bjorn Tharaldsen, the second mate, and Olav Arntsen, the quartermaster at the wheel. Pilot R. J. Wesley was also on the bridge from the time he boarded the BETTINA until the collision.

9. The BETTINA got under way at 0610 and circled to her starboard to head for the Canal entrance. The pilot put the engine on half ahead at 0617 and after passing the sea buoy to port, steadied on a course of 305° and put the engine on full ahead, at 0624.

10. At 0615 hours the GABONKUST's second mate took cross bearings on several landmarks and fixed the position of GABONKUST at 08° - 53' - 40" North latitude and 79° - 31' - 15" West longitude. The bearings were:

| | | |
|---|---|---|
| 1. | San Jose Rock | 030 True |
| 2. | Flamenco Light | 348 True |
| 3. | Buoy #4 | 282 True |

GABONKUST had gone to this area of the Pacific Anchorage in order to pick up the vessel's laundry. At 0615 hours she was on a heading of approximately east with her engine stopped.

11. On the morning of May 16, 1968 the following vessels were anchored in the Pacific Anchorage at the following positions:

| | | | |
|---|---|---|---|
| 1. | LINGLEE | 08° — 53' — 31"N | 79° — 31' — 24"W |
| 2. | TEXACO TEXAS | 08° — 53' — 21"N | 79° — 31' — 00"W |
| 3. | AFOUNDRIA | 08° — 53' — 18"N | 79° — 30' — 35"W |
| 4. | MAYO LYKES | 08° — 52' — 41"N | 79° — 29' — 56"W |
| 5. | NORD FELS | 08° — 52' — 21"N | 79° — 29' — 57"W |
| 6. | FAHRMANNANO | 08° — 52' — 32"N | 79° — 29' — 45"W |
| 7. | BONO MARU (A/K/A BUKO MARU) | 08° — 52' — 05"N | 79° — 29' — 41"W |
| 8. | PASSARATE | 08° — 52' — 39"N | 79° — 29' — 12"W |
| 9. | MARIA TAGUS | 08° — 52' — 08"N | 79° — 29' — 19"W |

Due to the prevailing wind and tide conditions all the anchored vessels (except the AFOUNDRIA) were heading in a more or less east northeasterly direction (020°).

12. An Israeli-flag vessel, HAR TABOR, completed her southbound transit of the Canal following GABONKUST. The HAR TABOR did not follow GABONKUST into the Pacific Anchorage but proceeded to the end of the Pacific entrance channel and passed between buoys # 1 and # 2. The Court takes judicial notice of the fact that pursuant to the provisions of 35 CFR 105.1(c) Panama Canal pilots normally disembark at buoys # 1 and # 2 of the Pacific Entrance Channel and that therefore beyond that point, HAR TABOR did not have a Panama Canal pilot aboard.

13. The BETTINA's pilot first sighted the GABONKUST more than a mile off his starboard bow, navigating on a southerly course in the anchorage, at about the time the BETTINA passed the sea buoy. He realized that the GABONKUST was the holding-on vessel. Nevertheless, after increasing the BETTINA's speed to full ahead, her pilot sounded two blasts on the whistle, intending this signal as a proposal that the GABONKUST alter her course to port and pass the BETTINA starboard-to-starboard. That is what this signal would have indicated under the Inland Rules, but the BETTINA's pilot knew he was in waters where navigation is governed by the International Rules, under which the two-blast signal meant that the BETTINA was altering her own course to port, which her pilot did not do.

14. Receiving no reply, which would have been required under the Inland Rules but not under the International Rules, the BETTINA's pilot sounded a danger signal of five short blasts (a signal not authorized under the International Rules) and rang dead slow ahead on the engine telegraph, recorded in the engine room at 0627 plus. He repeated his two-blast signal and thought he heard a one-blast reply from the GABONKUST (which vessel did not, in fact, sound any one-blast signal). The BETTINA's pilot then repeated the danger signal and stopped the engine, at 0629. He rang full astern at 0630 plus and sounded a three-blast backing signal. A minute later he rang emergency full astern and sounded another danger signal. He did not order the anchor dropped because he believed the forward momentum of the heavily-laden BETTINA would pull the windlass right out of the deck.

15. The collision occurred at 0632 about a mile inside the sea buoy, on the High Seas. The BETTINA's bow, swinging rapidly to starboard under the influence of her propeller turning astern, struck the GABONKUST's port side amidships a glancing blow. The BETTINA's speed was reduced, from about eight knots five minutes before the collision, to one or two knots.

16. The GABONKUST had transited the Canal, dropped her pilot, and turned into the Balboa Anchorage to wait for some laundry to be delivered. She then got under way again at 0618 and, having maneuvered around two anchored vessels, went full ahead on 165° at 0621, turning onto a heading of 175° at 0623. There was another outbound vessel, the HAR TABOR off the GABONKUST's starboard quarter, and the watch officer took bearings and determined she was on a course parallel to the GABONKUST's.

17. The GABONKUST's master had observed the BETTINA maneuvering from the anchorage in a southeasterly direction, and then lost sight of her behind the anchored vessels on the GABONKUST's port side. Some time between 0625 and 0630 the GABONKUST's master heard a two-blast signal from port, but could not see the vessel which sounded it and did not consider that the unseen vessel was signalling to him. Less than a minute later, however, he saw the BETTINA's mast and shape moving behind the anchored vessel nearest the sea buoy, on a crossing course with the GABONKUST, which was the holding-on vessel. The GABONKUST

was still on 175° and full ahead, making a little less than seven knots. The BETTINA sounded two danger signals, and the GABONKUST's master then saw her bow coming out from behind the anchored vessel on collision course. He immediately rang full astern at 0631, and ordered the watch officer to sound the three-blast backing signal, and he heard a backing signal from the BETTINA, whose bow began to swing to starboard. When he saw that there would be a collision, the GABONKUST's master rang the general alarm and full ahead, in a unsuccessful effort to swing the stern clear. The GABONKUST was about dead in the water when she was struck, at 0633 GABONKUST time (which was, therefore, a minute ahead of BETTINA time).

18. There were no personal injuries or cargo damages, but both vessels sustained damage. The BETTINA was delayed at Balboa until it could be determined that she was seaworthy to proceed on her voyage. Her repairs were carried out at Yokohama. The GABONKUST effected temporary repairs to enable her to get to Curacao, where permanent repairs were carried out.

19. Following the collision, at 1340 hours on May 16, 1968, Canal Zone Government Board of Local Inspectors commenced an investigation into the circumstances surrounding the collision between the BETTINA and the GABONKUST. The Board concluded its taking of proof at 2225 hours on May 16. The opinion of the Board was rendered on July 2, 1968 and was as follows:

"1. That the proximate cause of the accident was the failure of the master of the MS GABONKUST to recognize the special circumstances that arose when the burdened vessel, the MS BETTINA, could not go to starboard, to port, nor full astern, when risk of collision occurred, bringing Rule 27 of International Rules of the Road into effect, and his failure to take timely and proper action to prevent collision, as required in Rule 21 of International Rules of the Road.

2. That there was fault on the part of the master of the MS GABONKUST for his failure to take timely and proper action.

3. That there was fault on the part of the pilot of the MS BETTINA, Captain Bivin, for blowing a two blast signal to the MS GABONKUST, indicating he was altering course to port when, in fact, his vessel was on a steady course, in violation of Rule 28–A [28(a)], International Rules of the Road.

4. That there was no fault on the part of the MS BETTINA, her master or crew.

5. That there was no fault on the part of any other Panama Canal Company employee."

20. The parties have stipulated that the cost of repairs to the GABONKUST, including incidental expense and loss of time totalled $178,674.02.

21. The parties have stipulated that the cost of repairs to the BETTINA, including incidental expenses and loss of time, totalled $56,989.97.

22. Anticipating a claim from the GABONKUST interests, the BETTINA's underwriters retained surveyors to attend the examination of the GABONKUST at Panama and during her permanent repairs at Curacao. The parties have stipulated that the reasonable cost of such surveys was $488.50 at Panama and $3,315.00 at Curacao and that such costs were incurred as a result of the collision.

23. The GABONKUST's Dutch owners arrested the BETTINA in Rotterdam in February, 1970, claiming 655,000 Dutch Guilders ($185,000 at the then exchange rate of one dollar to 3.60 Guilders) damages plus interest, for the repairs and loss of use of the GABONKUST. The BETTINA was released on posting a 750,000 Guilder bank guarantee, and a settlement discussion was arranged. The defense of the action was tendered to the Panama Canal Company, which was invited to, but declined to, at-

tend the conference and disclaimed liability.

24. At the settlement conference with the GABONKUST interests the BETTINA's Dutch and Norwegian attorneys negotiated a settlement which on the damages figures claimed by the two vessels represented approximately 70/30% in GABONKUST's favor and meant a payment by the BETTINA of 380,000 Guilders ($105,556) plus interest during the period asked by the BETTINA interests in which to advise the Panama Canal Company and seek its approval. The defendant was advised, but refused to take any position, and the settlement negotiated with the GABONKUST, was therefore, paid by the BETTINA interest on June 22, 1970, in the amount of 380,380 Guilders ($105,661.11).

25. The settlement was reasonable in amount. The Dutch maritime board of investigation had exonerated the GABONKUST from any fault, and the board's findings are accorded great weight by the Dutch courts, particularly so in this case because the presiding officer of the board also sits as a judge on the court to which appeals of Rotterdam maritime cases are taken. The BETTINA interests were advised that the Dutch court would apply the proportionate fault rule of the Collision Convention, to which Norway and The Netherlands are signatories, and their experienced Dutch and Norweigian maritime collision attorneys advised that in the circumstances of this case the BETTINA—as the vessel obliged to give way in a crossing situation, but which had failed to give the right of way to the smaller GABONKUST, and whose pilot had been found by both the Canal Zone and Dutch investigating boards have sounded misleading signals in violation of the International Rules for the Prevention of Collision would in their opinion be held in greater fault. The result of litigation would have been 75/25% in favor of the GABONKUST, according to the BETTINA's Dutch attorney, the dean of the Rotterdam maritime law bar. In addition, the BETTINA's Dutch attorney was of the opinion that

the GABONKUST might be awarded 12½% interest on any judgment. If the Dutch litigation had not been settled, the judgment against the plaintiff would in all probability have been for more than 380,380 Dutch Guilders.

26. The reasonable and necessary cost of the plaintiff of defending the suit brought by the GABONKUST's owner was the fee and disbursements of the plaintiff's Dutch attorney in an amount equivalent to $2,166.70 and an amount equivalent to $2,918.16 of the fee and disbursements of the plaintiff's Norwegian attorney. The plaintiff's Panama and United States attorneys did not participate in the defense of the Dutch litigation.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this cause pursuant to the Admiralty Clause of the United States Constitution and Sections 292–296 of Title 2 of the Canal Zone Code, P.L. 87–845, 76A Stat. 23.

2. The International Rules for the Prevention of Collisions at Sea, 33 U.S. Code Sections 1051 et seq. govern the navigation of the vessels involved in this collision.

3. The pilot of the BETTINA was in violation of Articles 19, 22, 23 and 28 of the International Rules in that this vessel being in a crossing situation with the GABONKUST on her starboard side, he failed to navigate the BETTINA so as to keep out of the way of the GABONKUST (Art. 19) and to avoid crossing ahead of the GABONKUST (Art. 22), he failed to take timely steps to reduce the BETTINA's speed upon approaching the GABONKUST (Art. 23), and he sounded a signal meaning that he was directing the BETTINA's course to port when in fact he did not change her course (Art. 28).

4. There was no fault on the part of the master, officers, and crew of the BETTINA.

5. The GABONKUST maintained a proper lookout and was in compliance

with the requirements of Article 21, of the International Rules, which obliged her to keep her course and speed until she found herself so close that collision could not be avoided by the action of the BETTINA alone, whereupon the GABONKUST's engine was put full astern, the action which would best aid to avert or minimize collision. Prior to the time her engine was put full astern, the GABONKUST was neither aware of, nor on notice of, any special circumstances which rendered a departure from the Rules necessary to avoid immediate danger (Art. 27).

6. Both the pilot of the BETTINA and the master of the GABONKUST violated Article 29 of the Rules in that by putting the engine of the vessels under their conn at full ahead in the crowded Balboa Anchorage, they neglected the precaution of proceeding at reduced speed as required by the circumstances.

7. The several navigational faults of the BETTINA's pilot, for which the defendant is responsible, were more serious than the GABONKUST's fault of excessive speed, of which the BETTINA's pilot was also guilty, and to a greater degree because the BETTINA was heavily laden and thus much harder to stop than the GABONKUST when danger of collision arose.

8. The defendant has failed to sustain the heavy burden imposed by The Pennsylvania, 19 Wall. (86 U.S.) 125, 22 L.Ed. 148 (1873), of showing that its employee's numerous statutory violations could not have contributed to the collision, and those faults did in fact cause the collision.

9. As was said by the Board of Local Inspectors "the proximate cause of the accident" was the failure of the GABONKUST and the BETTINA to take "timely and proper action to prevent collision". Fault was found on the part of the "master of the M/S GABONKUST for his failure to take timely and proper action and fault was found by the Board on the part of the Panama Canal Company pilot of the M/S BETTINA for blowing a two blast signal to the GABONKUST, indicating he was altering course to port when in fact his vessel was on a steady course.

The Board did not attempt to make any apportionment of fault and this is indeed difficult. A slight change of course or a different speed on the part of either may have prevented the collision. The American Rule for dividing damages in case of mutual fault is one of simplicity and although at times it may work hardship it has considerable merit because of the difficulty of correctly appraising the extent of fault. This rule was followed by England until the International Convention of 1910.

The countries of Norway and Holland are signatories of the 1910 Convention which provides for the apportionment of damages between two vessels at fault and this collision occurred in international waters. The United States is not a signator of the 1910 Brussels Convention but its Congress provides for a comparative negligence rule in the Canal Zone; 4 C.Z.C. § 1357.

10. 2 C.Z.C. § 292, pursuant to which this action is brought, is an integral part of a complete code subchapter designed to delineate the liability of the Panama Canal Company for vessel accidents and these statutory provisions were intended by Congress to apply to all accidents to vessels embraced by the act whether a single vessel is involved or multiple vessels are in the accidents.

■ ■ 11. The comparative negligence standard involves a weighing of faults and while not complicated in theory it is inexact, for who can say that one vessel was 75% to blame and another 25% to blame or that they are equally to blame with any degree of accuracy. It is an approximation at best. In view of this the decision of settlement between the two ships while not controlling on this Court should be given great weight. The litigation in Holland was serious, and the settlement was conducted by highly competent people with vast experience in maritime affairs. The defendant while not a party to the litigation was invited to participate in the settlement conference and had it done so could speak with greater voice in this lit-

igation if it was not satisfied with the results of the settlement between the vessels. Where a claim is tendered to a defendant, who is given the opportunity to participate in a settlement proof of the reasonableness of the settlement made by plaintiff with the third party would be sufficient to support a judgment for indemnity against the defendant. Whisenant v. Brewster-Bartle Offshore Co., 446 F.2d 394 (5th Cir. 1971), also see Parfait v. Jahncke Service Inc., 484 F.2d 296 (5th Cir. 1973).

This Court is the exclusive forum for this kind of action against the Panama Canal Company as has been established by Congress and the tendered defense of the litigation in the name of the BETTINA in the courts of Holland has no merit but the defendant should have participated in settlement negotiations and its disclaimer of fault and failure to participate puts the defendant in a position of inability to complain as to its reasonableness.

12. This Court therefore approves the settlement and adopts it in fixing the percent of fault. The stipulated damages to the BETTINA are $56,989.79 and to the GABONKUST are $178,674.02 making a total of $235,663.-99. The amount paid in settlement by BETTINA to the GABONKUST of 380,380 Guilders ($105,661.11) plus its loss of $56,989.79 is a total of $162,650.-90 which shall be recovered from the defendant by the plaintiff.

The percentage of fault is therefore as follows:

BETTINA's damages were $56,989.79 and GABONKUST's damages were $178,674.02. As GABONKUST settled for $105,661.11 she assumed a loss of $73,013.29. BETTINA's damages of $56,989.79 pus $105,661.11 amounts to $162,650.90. Thus BETTINA's fault would be about 70% and GABONKUST's about 30%.

13. The plaintiff is entitled to recover the amounts paid to its Dutch and Norwegian attorneys; $1,985.98 for Dutch counsel and $2,927.53 for Norwegian counsel.

14. Plaintiff is entitled to recover the amounts expended in surveying the GABONKUST at Mount Hope for $488.-50 and at Curacao of $3,315.00 as these sums were reasonably expended in defense of the claim against the BETTINA.

15. Interest on the entire amount of plaintiff's recovery is allowed from the date of filing suit, May 5, 1971 at the rate of 6 percent annum. The libelant delayed the filing of suit to just before the expiration of the statute of limitation. See Chagois v. Lykes Bros. S. S. Co., 432 F.2d 388 (5th Cir. 1970): The John J. Timmins, D.C., 14 F.2d 435.