Webster Barnwell **ARMSTRONG, III,** et al.

v.

**CHAMBERS & KENNEDY** et al.

**Civ. A. No. 70-H-1171.**

United States District Court,
S. D. Texas,
Houston Division.

Jan. 11, 1972.

As Amended March 7, 1972.

*Memorandum and Order*:

SINGLETON, District Judge.

Late in the afternoon of May 28, 1970, explosions and fire occurred on the Chambers & Kennedy (C & K) Offshore Oil Platform, an unmanned collection platform for oil wells in Block 189–L, located 12 miles southeast of Galveston, Texas. The holocaust that ensued resulted in the death of five workmen, one supervisor, and three crew members of the standby boat, M/V CARRYBACK, which was moored below the platform. Six other platform workers were hospitalized. The burning vessel was retrieved, but the damage it sustained rendered it beyond repair. All of the tanks on the platform were destroyed or distorted beyond repair. The platform itself received severe damage calling for extensive repairs. The oil in the tanks ultimately found its way to a part of the beaches near Galveston necessitating substantial costs in removing this pollutant.

The complexity of the liability issues here in question dictates a thorough review of the events which culminated in this tragic loss of life and property. C & K had purchased the platform with a capacity of 5,000 barrels of oil in a somewhat deteriorated state in 1968. After some discovery wells were drilled, the platform was used to store crude oil which was produced from satellite wells 4,000 feet from the platform. Crude oil from one producing well was piped through a separator to a cylindrical tank called a gun barrel. When this tank filled, the oil flowed into one of five storage tanks, thence through equalizing lines to the other four tanks. The tanks were sounded regularly, and when enough oil had accumulated, it was transported by barge to the shore. C & K hired, under a written well service agreement dated December 1, 1968, the engineering firm of Drilling Engineering, Inc. (DEI) to operate and maintain the platform. This agreement included an indemnity clause that will be thoroughly discussed later. It was the intention of

Warner F. Brock, Brock & Williams, Houston, Tex., for plaintiffs.

Frank Harmon, Baker & Botts, Houston, Tex., for defendants.

the parties to the contract, C & K and DEI, that all work in question that was to be performed on the platform, including repairs, alterations, production of the wells, and all work necessary to bring the platform up to the standards and regulations set by the United States Geological Survey was to be carried out under the December 1, 1968, contract. The cutting of the equalizer valve was work done under this contract and in compliance therewith. A letter dated April 28, 1970, was nothing more than a report from DEI to C & K on the status and progress of the platform work and, as stated in the letter, an outline of work "required for complaince with United States Geological Survey requirements" (Harvey Exhibit 4). This letter did not constitute a new agreement between the parties.

On March 18, 1970, Mr. George Kinsel of United States Geological Survey wrote Lyle Harvey of C & K and suggested that the platform be brought into compliance with 30 C.F.R. 250.49 and 30 C.F.R. 250.46 safety regulations. On April 3, 1970, Mr. Kinsel called Mr. Harvey suggesting that C & K voluntarily shut down the field.

On April 8, 1970, all production from all the wells was ordered shut down by Mr. Harvey, an employee of C & K. This order was communicated to Mr. Chenier of DEI. At least as of April 10th all production was shut down. On April 11th all of the oil that was then in the tanks was taken out by means of a barge. Thereafter and sometime between April 11 and May 28, some production out of one of the wells came about and somewhere in the neighborhood of 1,100 barrels of oil was pumped into the tanks.

C & K knew that this oil was in the tanks through Mr. Harvey. DEI knew that this oil was in the tanks through Mr. Chenier. At this time, Mr. Ray was DEI's engineer on the job, and Mr. Ray knew that this oil was in the tanks.

On May 23rd, Mr. Ray had to leave the job because of an abscessed tooth and

Mr. Monk took over and became the DEI engineering supervisor on the job, working under Mr. Chenier. Mr. Ray told Mr. Monk that there was oil in the tanks, so that as of at least May 23rd, Mr. Monk knew there was oil in the tanks.

In the course of their work, DEI hired Fenstermaker, Behling, Pollock & Associates, an engineering firm of Lafayette, Louisiana, to make a studied survey of the platform and the anticipated needs for the restoration work contemplated. It is important to note that in the report to C & K developed from the Fenstermaker study, DEI did not recommend incurring the expense of draining any residue oil from the tanks. The platform had been shut down for alterations and repairs for several weeks prior to the casualty. The work on the platform consisted mainly of sandblasting, painting, renovation of the structural members, installation of prefabricated drip pans under the oil tanks, and fitting a closed draining sump system. This work necessitated burning and welding on the platform, but testimony indicates that any hot work was to be done on the end of the platform furtherest away from the oil storage tanks.

DEI did not have the manpower called for to complete the operations required, thus they had in turn contracted out the actual physical labor needed on the platform to the firm of Hydrotech. However, as of May 23, 1970, DEI had become dissatisfied with Hydrotech's performance and had decided to hire another firm to supply the men to complete the work. Mr. Williams, president of DEI, contacted Chapman Contracting Service Company (Chapman) to take over the job. On Sunday, May 24th, Ricky Chapman, vice president of Chapman, met with William Ray, a member of the DEI firm and at one time the DEI supervisor on the platform, in Galveston to discuss the job. At that time, Mr. Ray told Mr. Chapman some of the details of the job and the working conditions that existed on the platform, namely, that there was oil in the tanks, that the platform was like working on a bomb, that it was nec-

essary to use good safety regulations, and that everyone should be extremely cautious. Mr. Ray explained that Mr. Monk, the deceased DEI supervising engineer, was in charge of the job. Mr. Ray also explained that the work consisted of certain tasks that necessitated welding. On Sunday, May 24th, Ricky Chapman went to the jobsite and inspected the platform himself. The following Monday, May 25th, Mr. Chapman assembled twenty-two workmen including four supervisors for the work. On Tuesday, May 26th, the Chapman men did their first day's work on the C & K platform. Ricky Chapman along with Mr. Chenier, a DEI engineer, were both on the platform again on the day of the explosion, leaving two hours before the casualty.

All of the Chapman workers, as well as the DEI supervisors, were transported from the shore to the platform every day, used the facilities of, and received their meals on the standby boat, the M/V CARRYBACK. The M/V CARRYBACK, operated by Dearborn Marine Services, was a boat without an inspection certificate and captained by an unlicensed master. The corporations Freeport Operators, Dearborn Marine, and Thoroughbred are all owned by one parent company, all having interlocking directors and officers. For the purposes of this case, they have agreed to and will be treated as one entity. Joe Dyer was an officer of each of these corporations. Mr. Dyer had the authority to hire and fire employees and to make contractual arrangements regarding the use of the boats, including the CARRYBACK, owned and/or operated by Dearborn Marine and to supply crews that were on the payroll of Freeport Operators to man the boats. Thoroughbred owned all of the boats including the CARRYBACK and had an arrangement with Dearborn Marine whereby Thoroughbred bare-boat chartered the boats to Dearborn.

On Wednesday, May 27th, three representatives of the United States Geological Survey landed by helicopter on the platform and advised the engineer in charge that it was going to be necessary to remove a valve from the overflow line between two of the crude oil storage tanks. This was required to bring the platform into compliance with U.S. anti-pollution regulations. However, at some time before the casualty, Mr. Chenier, an employee of DEI, had been advised by Mr. Kinzel of the United States Geological Survey that the valve on the equalizer line had to be removed. On the day of the casualty but before the explosion, Mr. Chenier discussed with Mr. Monk the necessity for the removal of the valve. The removal of this equalizer valve was the first work on the platform to require the breaking of any connections leading to the oil storage tanks. Indeed, on the day of the casualty, but before the explosion, Mr. Monk, the DEI supervisor, discussed with Mr. Overly, the Chapman foreman, the operational aspects of the removal of the valve from the equalizer line.

On the day of the casualty but before the actual casualty, Mr. Overly instructed Mr. Scanlan, a pusher for Chapman, to remove the valve from the equalizer line. Mr. Scanlan, along with the two other Chapman employees, began working on the equalizer line and broke the union and cut the pipe with a pipe cutter. They took out the valve leaving a part of the equalizer line protruding in place. They then proceeded to take the valve and the other part of the equalizer line to the south end of the platform beneath the heliport and there fabricated, or threaded, a new piece of pipe called a nipple to put back in the equalizer line and reconnect it. Mr. Scanlan then went back to the equalizer line and screwed the new nipple in place. This procedure left two pieces of pipe to be connected together. Mr. Scanlan talked to Mr. Monk and told Mr. Monk that he was going to connect these two pieces by welding them. The facts do not reflect where this conversation took place— whether on the platform or on the CARRYBACK. The facts do not indicate whether or not Mr. Monk told Mr. Scanlan to weld the line *in place*, or whether

Mr. Scanlan told Mr. Monk he was going to weld the line in place. But the facts do reflect that at some time before the explosion Mr. Scanlan told Mr. Monk he was going to weld the line.

On the day of the accident, the wind was blowing between five and eight knots, there was work being performed on the platform in the area of the scrubber in connection with which welding operations were being conducted, there were two diesel compressors operating, there were sandblasting operations going on, and all-in-all, the conditions at the side were such that there would have been dificulty encountered in oral communications between workers.

Mr. Scanlan told Mr. Gaspard, a Chapman welder, and Mr. Breaux, a welder's helper, to weld together the two pieces of pipe that now constituted the equalizer line. Mr. Overly should have known of the anticipated welding on the equalizer line and should have been in the area in which the work on the equalizer line was going on. Mr. Gaspard began the welding and at the time that he struck an arc, there was an explosion. Burning oil then rapidly spread fire across the platform, resulting in injuries and damage there.

The explosion caused flaming oil to be blown up directly above the platform into a flaming ball then to be carried by the wind out over the water and to fall as if it were an exploding bomb onto the CARRYBACK. Thus, the CARRYBACK was instantaneously wrapped in consuming fire. At this moment of time, Captain Armstrong, crew members Love and Cassel, and Mr. Monk were all on board the CARRYBACK and all perished.

Chambers & Kennedy filed a civil action against DEI and Chapman seeking recovery of all damages and losses sustained by them as a result of the extensive damage done to the platform, and expenses entailed in cleaning up and controlling the pollution which resulted from the oil which escaped into the water in connection with the explosion in the

storage tanks, and also sought indemnity against DEI and Chapman against any claims by third parties. Dearborn Marine Service filed a limitation of liability proceeding, seeking exoneration or limitation of liability as the owner *pro hac vice* of the M/V CARRYBACK. The heirs of Webster Armstrong, Master of the CARRYBACK, filed a civil action seeking to recover damages on account of the death of Captain Armstrong, against C & K, DEI, Chapman, and Freeport Operators. The other crew members on the CARRYBACK joined in that suit. A number of Chapman employees intervened in the Armstrong suit, seeking to recover their damages against C & K and DEI.

The heirs of Mr. Monk filed suit seeking to recover damages for the death of Mr. Monk against C & K, Chapman, and the boat company.

Additional civil actions were filed in federal court in Lafayette, Louisiana, by employees of Chapman, seking damages against C & K and DEI and were by agreement of the parties transferred to this court and consolidated for trial with the above-captioned causes on the question of liability only.

Prior to trial, settlements were made of the cases of the crew boat captain and crew, under the terms of which all claims and causes of action for the death of the master and crew of the CARRYBACK were assigned to the attorneys representing the underwriters of C & K and DEI, save and except whatever cause of action there might be against Freeport Operators and Dearborn, with the proviso that no recovery would be made on such claim or cause of action against the boat company, should the boat company be entitled to indemnity from either DEI or C & K or Chapman.

All of the defendants, C & K, DEI, Chapman, and the boat companies, sought indemnity and contribution from each other.

During the course of the trial, C & K and the boat company, with the approval of DEI, agreed to a settlement of their

property damage claims against Chapman. Therefore, their suits for property damage against Chapman are dismissed. The attorneys representing C & K and DEI's underwriters also move the court during the trial to dismiss on behalf of Armstrong, Cassel, and Love as to C & K and DEI. Accordingly, the motion to dismiss is granted.

### JURISDICTION

■ The litigation involving the platform itself and all the workers injured or killed thereon, as well as all the subsidiary issues raised by these suits, is controlled by the provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333. This statute makes applicable the laws of the adjacent state, in this case, the State of Texas, "to the extent that they are applicable and not inconsistent . . . with other Federal laws and regulations." Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1967); Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

Concerning the deaths and injuries that arose from the men jumping into the water from the platform, the Outer Continental Shelf Lands Act will apply. Bertrand v. Forest Oil Corp., 441 F.2d 809 (5th Cir. 1971).

■ In regard to claims arising from casualties on navigable waters, such as the one here involving the CARRYBACK, the crew members Armstrong, Cassel, and Love, and the engineer Monk, general maritime law will apply along with statutory enactments of a remedy for Death on the High Seas. 46 U.S.C. § 761 et seq. The Supreme Court has clearly stated that "an action does lie under general maritime law for death caused by violation of maritime duties." Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (accident within state water limits).

### LIABILITY OF C & K

The Outer Continental Shelf Lands Act enacted on August 7, 1953, authorizes the Secretary of the Interior at any time to prescribe and amend such rules and regulations as are appropriate and necessary for the regulation of oil leases on the Outer Continental Shelf. Pursuant to this enabling legislation, the Secretary has promulgated the following rules:

"§ 250.45 Accidents, fires, and malfunctions.

In the conduct of all its operations, the lessee shall take all steps necessary to prevent accidents and fires, and the lessee shall immediately notify the supervisor of all serious accidents and all fires on the lease, and shall submit in writing a full report thereon within 10 days. The lessee shall notify the supervisor within 24 hours of any other unusual condition, problem, or malfunction.

"§ 250.46 Workmanlike operations.

The lessee shall perform all operations in a safe and workmanlike manner and shall maintain equipment for the protection of the lease and its improvements, for the health and safety of all persons, and for the preservation and conservation of the property and the environment. The lessee shall take all necessary precautions to prevent and shall immediately remove any hazardous oil and gas accumulations or other health, safety or fire hazards."

■ This court must interpret the congressional intent and the Secretary's reasons for promulgating the regulations as imposing certain nondelegable duties upon C & K, as the lessee and owners of the platform. The public policy indicated by these legislative and administrative acts are imperative to the common good and protection of our national community. Thus, *any* violation, even a nonfeasance, of the guidelines set as preventive measures to accidents must expose the lessee to ultimate liability in

tort. C & K was continuely aware of the shabby condition of the platform, the presence of oil, and other "safety and fire hazards" like oil-soaked boards as well as the very notification by officials of the United States Geological Survey that the platform was substandard according to regulations and needed to be brought into compliance with such regulations (Harvey Exhibits 13, 14, and 15). Indeed, this was part of the very reason for the work on the platform. Safety equipment on the platform was also inadequate for only one life buoy and four work vests were available on the platform on May 28th.

■ Even if this nondelegable duty were not set by statute, the court would have to impose it. The exploration and development of offshore oil resources under the seas is a relatively new area of technological progress. Unlike the search for oil and gas on land, it presents new and more dangerous challenges in its development. 35 Tex.L.Rev. 1; 33 Tex.L.Rev. 574; Warren Petr. Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410, reh. den. (1954). Thus, the duty placed here upon the oil lessee is similar to the traditional tort duty of one using an ultrahazardous substance. The basic soundness of this reasoning is revealed by the position taken by the Restatement Torts Second:

> "§ 416. Work Dangerous in Absence of Special Precautions

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

> "§ 427. Negligence as to Danger Inherent in the Work

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

*Contra* Parsons v. Amerada Hess Corp., 422 F.2d 610 (10th Cir. 1970) (this case did not adopt this Restatement theory).

■ Texas law seems to circumvent this theory of an occupier's, or owner's, or employer's duty under the holding of Delhi-Taylor Oil Corp. v. Henry, 416 S.W.2d 390 (Tex.1967). *Delhi-Taylor Oil Corp., supra,* also seems to be a special exception carved out by the Texas courts to insulate the landowner once he warns the contractor of any dangerous conditions. Gulf Oil Corp. v. Bivins, 276 F.2d 753 (5th Cir., 1969), is similar to this Texas case. *Bivins* involved a land-based well where the injured employee had bled the well himself but was not warned of the presence of iron sulphide which supposedly ignited the explosion. The court held that a warning given to the foreman and not the injured workman by the owner could and did discharge its liability. However, these cases do not involve a statutory duty upon the owner to comply with certain safety regulations on their premises. Under the authority of these cases the facts of the instant case reveal that C & K gave DEI an adequate warning as to the condition of the premises, thereby satisfying C & K's common law duty to any subcontractor's employee who was injured.

Nevertheless, this does not extinguish the strict liability imposed upon C & K because of the violation of the government regulations. The violations of the instant safety requirements are undoubtedly a proximate cause of the damages and deaths that occurred. Under all the evidence, it is manifest and indisputable that the loss of life (other than Gaspard), the burning of the CARRYBACK and the four men aboard that vessel, and a substantial part of the

damage to the platform itself was caused by burning oil rather than the explosion. The failure to remove this oil and the resultant oil-soaked platform was in direct violation of 30 C.F.R. 250.-46. All of the oil except the heavy sludge in the tank bottoms could have been floated out and barged away as was in fact done with a portion of the oil. Therefore, C & K cannot escape the statutory liability imposed upon it by these regulations.

## LIABILITY OF DEI

The responsibilities assigned to DEI by C & K are spelled out in the written well service agreement dated December 1, 1968. In that agreement, DEI contracted to operate the platform and the production equipment. DEI further agreed to follow United States Coast Guard and United States Bureau of Land Management regulations and do their job in a workmanlike manner.

"DEI shall take cognizance of all regulations issued by the United States Coast Guard, United States Bureau of Land Management and other regulatory authorities affecting said offshore facilities, and any future amendments and modification thereof, and shall cause said offshore facilities to be maintained and operated in accordance with such regulations (including the preparation and filing of any reports required by such regulations), or if DEI is unable to comply with such regulation, DEI shall promptly notify ZAPATA–C & K, and shall render such assistance as ZAPATA–C & K, may reasonably request in order to comply with such regulations.

"DEI agrees to make minor repairs and such adjustments of production equipment, machinery and appurtenances as would appear reasonably necessary to a prudent operator.

\* \* \* \* \* \*

"DEI shall perform the services to Zapata-C & K required herein in a good and workmanlike manner and shall have the right and duty to conduct and perform such services in accordance with what a prudent operator would do under the same or similar circumstances." Contract of December 1, 1968 (Harvey Exhibit 12).

The elements of this agreement set the limits of contractual liability as between DEI and C & K. It would be difficult to say that DEI's failure to observe the letter of the regulation found in 30 C.F.R. § 250.46 by not removing any hazardous oil results in strict liability in tort for DEI, since DEI is not the lessee. Nevertheless, measured by the common law standards of duty in tort, DEI's actions and omissions are held to constitute negligence. DEI must be held responsible for the negligent and lackadaisical manner in which the removal of the equalizer valve was conducted. Mr. Chenier himself was on the platform in the midst of this operation and took no steps to insure a safe and workmanlike performance of the task. Mr. Chenier was Mr. Monk's superior in the DEI organization, who had been in charge of the overall platform operations from the beginning of the work. Consequently, Mr. Chenier, although not continuously or daily on the platform, was ultimately more familiar with the status of the job and procedures to be followed. Mr. Chenier is also the one who would have known if a dresser coupling had been ordered to complete the removal of the equalizer valve without a need for welding. Mr. Chenier's more extensive knowledge would be based not only on his position in firm operations, but also on the fact that he had worked continually with the C & K platform and Mr. Monk had replaced Mr. Ray, the previous platform supervisor, only a few days before the explosion. DEI's failure to notify C & K of the extremely volatile condition on the platform or to initiate safety precautions on its own once the equalizer lines were cut and the vapors from the tanks were being emitted into the area of work, represents not only a violation of the ordinary, prudent man standard, but also a high disregard for human life.

As to the equalizer line, DEI had known since September 16, 1969 (Harvey Exhibit No. 18) that the equalizer line as part of the storm choke system had to be removed. DEI knew that this was work that would have to be done by Chapman and its employees. DEI did not adequately warn Chapman and its employees of the dangers incident to removal of the equalizer line. Mr. Chenier was intimately familiar with this platform; he knew of its condition; he knew that there was oil in the tank into which the equalizer line was connected; he knew that the valve on the equalizer line had to be removed; and it is not unreasonable to conclude that he could have and should have anticipated the possibility of the breaking of the equalizer line in order to remove the valve. This is particularly significant in that Mr. Chenier is the only person on the platform who would have known whether or not a dresser coupling had been ordered to be used in the operation of removing the valve from the equalizer line. If a dresser coupling were to be used, there would be no welding, merely a breaking of the union and a recoupling of the line.

On the day before the explosion, representatives of the United States Geological Survey were on the platform and at that time specifically told Mr. Monk to remove the equalizer line. There is no evidence that any employee of Chapman was in on that conversation. Taking all of these factors into consideration, this court concludes that the warnings given by DEI's supervisory personnel, Mr. Chenier and Mr. Monk, relating to the specific work of removing the valve on the equalizer line were not adequate warnings of the dangers involved. It is for this reason that the holding by the Supreme Court of Texas in Delhi-Taylor Oil Corp. v. Henry, *supra,* is not controlling in this case insofar as a defense to DEI. It should also be noted that in *Delhi-Taylor, supra,* the warnings were given to experienced foremen with long histories of work in the gas-line

fields. This was not the case with Chapman.

In summary, the failure of DEI in the following particulars constituted a failure to exercise reasonable care and proper supervision when viewed in the context of where the work was being performed and the inherent nature of same:

(1) to suspend all burning and welding operations while the equalizer line was open as a result of the removal of a section of the line;

(2) to seal this opening until that section of the line had been replaced;

(3) to carefully supervise the removal and reinstallation of the line to see that no welding or other work that could possibly produce an ignition would be undertaken in the performance of this operation; and

(4) to post warning signs on the tanks with instructions that no welding or hot work be done in this area.

All of these matters constituted negligence *per se* because each of them was a violation of the above-quoted regulations issued by the Secretary and each was a proximate cause of the fire and explosion which resulted in the deaths, personal injuries, and property damage involved herein.

## CHAPMAN'S LIABILITY

 Chapman's liability is based upon the failure of its supervisors to adequately and competently oversee the work of its employees. Mr. Overly, the head of the Chapman crew on the platform had control over the Chapman employees and the details of the job at the time the work was being performed on the equalizer line. Ricky Chapman, the highest ranking Chapman employee directly involved with the platform, like Mr. Chenier, was himself on the platform the day of the casualty. Ricky Chapman had personally surveyed the platform before he contracted to provide the workmen. However, it is significant that this was the first job that Ricky Chapman

had ever been involved with relating to work on an offshore drilling platform. He was aware as a result of his visit to the platform on Sunday, and his conversation with Mr. Ray, that this was hazardous work. However, it is the attempt to remove the equalizer line and the welding on that line that brought about the personal injuries and property damage that are involved in this case.

Ricky Chapman was present when the equalizer valve was cut and was negligent in not making sure there would be no welding in the area when the tanks' vapors were being emitted. Ricky Chapman was told by Mr. Ray on the Sunday preceding the casualty that the tanks had oil in them. Surely any reasonable, prudent man in the same or similar circumstances would have checked on the type of tanks his men would be working on in such a hazardous situation and would have advised or seen that his men were advised of the fact that there was crude oil in the storage tanks, and it was, therefore, not going to be safe to do any welding work on the tanks or on the lines leading into the tanks. It would not have been unreasonable for Chapman, in the absence of DEI's doing so, to post signs on the tanks to assure that all his men were aware of the contents of the tanks and the danger involved.

Other than Ricky Chapman, the Chapman employees who testified were Mr. Overly, who was the supervisor of the Chapman employees on the platform at the time; Mr. Scanlan, who was one of the tool pushers and, in that capacity, was the supervisor of Mr. Gaspard, the welder who actually ignited the vapors by attempting to weld on the equalizer line; and Mr. Breaux, who was Mr. Gaspard's helper. Of these four witnesses, this court ascribes the greater weight to Mr. Scanlan's testimony on the crucial issue of the welding on the equalizer line and the warnings given relating thereto.

Mr. Scanlan testified that he did not know there was oil in the tank; that Mr. Overly told him that the tanks were

safe; that he understood that to mean the tanks were not flamable; and that no one ever told him not to weld on the tanks or on the equalizer line involved. Mr. Scanlan testified that on the day before the explosion Mr. Monk told him that the valve in the equalizer line had to come out. Mr. Scanlan recalled in detail that the workmen were unable to remove the valve with wrenches, and that he asked Mr. Overly what to do, and Mr. Overly told him to get a pipe cutter and cut it out. Mr. Scanlan also testified that he discussed welding with Mr. Monk and that he told Mr. Monk he had to weld the pipe, although he did not tell Mr. Monk that he was going to weld on the line in place. Mr. Scanlan then testified that he directed Mr. Gaspard to do the welding on the equalizer line. If Mr. Scanlan had been so warned, as it was Chapman's duty to do, then it is most probable that Mr. Scanlan would not have directed the welder, Mr. Gaspard, to undertake to do any welding on the line in place. The failure to warn Mr. Scanlan of the presence of crude oil in the storage tanks constituted negligence on the part of Chapman which was a proximate cause of the resulting explosions and fire. Mr. Scanlan was negligent in not inquiring in greater detail about permission to weld in place from Mr. Monk, considering the noisy circumstances in which the question was asked. Mr. Scanlan, in his supervisory capacity, was also negligent in directing the welder to undertake to make a weld on the line without checking on the contents of the tanks himself. Reasonable prudence on his part would have required him to look into the tanks, through the hatch covers located on the tops of the tanks to check for the presence of crude oil and gaseous vapors in the tanks, before telling the welder to attempt to make a weld on the pipe.

It is inconceivable that Mr. Monk would have approved welding work on the line while it was in place between the tops of the two crude oil storage tanks, which, it must be concluded, he knew contained crude oil. The evidence

is rather vivid that the conditions on the platform when Mr. Scanlan asked Mr. Monk about the welding were less than ideal for communications; there were all types of machinery and work going on with the sea roaring and winds blowing. Thus, it is more than probable that Mr. Monk did not hear or understand Mr. Scanlan to be inquiring about welding in place on the tanks. Both Mr. Scanlan and Mr. Monk should have proceeded with caution and made certain that they fully understood the details of how the work was to be done in this extremely dangerous zone.

Mr. Gaspard, the welder who struck the incindiary arc, relying upon the orders of his supervisor, the pusher Scanlan, made preparations for welding the lines that lead into the tanks which resulted in the casualty. Mr. Gaspard's reliance on Mr. Scanlan's order was not negligent. However, his action in striking the arc pursuant to Mr. Scanlan's order was the proximate cause, not only of his own death, but also the other deaths, injuries, and damages which followed from the explosion and fire; and Chapman under a respondeat-superior theory is responsible for Mr. Gaspard's actions.

Mr. Scanlan's negligence is imputed to his employer, Chapman Contracting Service Company. Of course, the negligence on the part of Ricky Chapman in failing to see that all of his employees were specifically instructed concerning the hazards involved in the welding work on the lines and tanks is imputed to his company; and all of such negligent conduct on the part of Ricky Chapman, as well as his employees in the course of their employment, were proximate causes of the fire, explosions, and damages resulting therefrom.

■ The negligent conduct on the part of Chapman Contracting Service Company was a proximate cause, not only of the fire and explosions in the tanks and the damage to the tanks and the platform, and Mr. Gaspard's loss of life, but was also a cause of the deaths aboard the CARRYBACK. Chapman cannot escape liability for the consequences of its conduct, because it might have been possible for someone else to have filled the tanks with water, so as to minimize the effect of an explosion. Chapman was never told that the tanks had been filled with water or had been made inert and safe to weld upon, but had been given a warning that the tanks did in fact contain crude oil.

■ Likewise, Chapman's defense that it was not truly an independent contractor and responsible for the occurrences on the platform must be totally rejected. The Texas courts rejected that argument thirty years ago in a well-articulated opinion where a company owning special machinery and equipment and trained men for oil well work entered into a contract with a drilling company to "rent" such equipment and men. The lending company was held to be an independent contractor and liable for its employee's negligence.

"[The lending company] takes the position that it all over invariably operates under its work orders with the express understanding and intention to rent to all those who desire its services its special machinery and equipment and employees for squeeze jobs. The attitude is little, if anything, short of saying to those who need and desire to avail themselves of that specialized service that we own the necessary equipment and men which we rent or hire out for such purposes, the men upon the same basis as the equipment. It takes us back to our own ante-bellum days, to say nothing of the conditions our forebears fled. To permit individuals or concerns to commercialize the services of men on such basis is repugnant to all our American ideas of individualism and contrary, we think, to public policy." Herndon v. Halliburton Oil Well Cementing Co., 154 S.W.2d 163, 169 (Tex.Civ.App.-El Paso, 1941 rehearing denied).

Under the circumstances, the presence of crude oil in the storage tanks, being known to Chapman Services, not only by Ricky Chapman, but also by his superin-

tendent, Mr. Overly, does not permit Chapman to escape the consequences of their negligent conduct because of the quantity or amount of crude oil in the storage tanks. Accordingly, the negligence on the part of Chapman Contracting Service Company and its employees was a proximate cause of the deaths on the CARRYBACK, as well as the damages to that vessel and the damages and injuries on the platform.

### C & K's INDEMNITY

In the written well service agreement of December 1, 1968, referred to earlier (attached as Appendix I), DEI contractually agreed to indemnify C & K in the event of any of three types of occurrences:

"1. DEI will indemnify C & K if

(a) there is an injury to a DEI employee, and

(b) the injury is incident to or resulting from the operations or services performed by DEI.

"2. DEI will indemnify C & K if

(a) someone other than a DEI employee is injured, and

(b) the injury is caused by a negligent act or omission on the part of DEI, its servants, agents and employees.

"3. Any sub-contractor will indemnify Zapata-C & K if

(a) the sub-contractor or one of its employees or agents receives an injury, and

(b) the injury is incident to or results from the operations of, or services performed by, the subcontractor."

This court agrees with Justice Walker of the Texas Supreme Court when he said in a recent opinion

"In some cases it is fairly easy to discern an intention to afford protection even against the consequences of the indemnitee's negligence. The intent is usually clear, for example, where one person undertakes to indemnify another against liability for injuries or damage caused by defects in certain premises or resulting from the maintenance or operation of a specified instrumentality. When the indemnity agreement is expressed in these terms, the indemnitor ordinarily knows and certainly should be aware that he is assuming full responsibility for the particular premises or instrumentality. See Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775; Houston & T. C. R. Co. v. Diamond Press Brick Co., 111 Tex. 18, 222 S.W. 204, 226 S.W. 140; Stewart & Co. v. Mobley, Tex.Civ.App., 282 S.W.2d 290 (writ ref.). The indemnity provisions in this case . . . are incident to an undertaking by a subcontractor to do certain concrete work for the prime contractor. Agreements of that nature are usually made primarily to protect the general contractor against loss of liability resulting from operations or physical conditions over which he has no control and which are under the control of the subcontractor. See North American Ry. Const. Co. v. Cincinnati Traction Co., 7th Cir., 172 F. 214." Joe Adams & Son v. McCann Constr. Co., Tex., 475 S.W.2d 721, 724 (1971).

In that case a general contractor's written indemnity contract with the subcontractor was not upheld. There the general contractor laid forms for the subcontractor to use in pouring concrete. The forms collapsed in pouring operations injuring the subcontractor's employees. The contract indemnified the general contractor in broad terms and only denied indemnity in the event of "direct negligence" by the general contractor. The Supreme Court agreed with the trial court that the negligence of the general contractor would prevent it from receiving the protection of the indemnity clause when strictly construed in light of the whole contractual agreement. *See* generally Spence & Howe Constr. Co. v. Gulf Oil Corp., 365 S.W. 2d 631 (Tex.1963).

The case at bar presents a different situation from that presented

in *Adams & Son, supra.* Here, there was no evidence presented that C & K ever performed any work at any time on the platform. To the contrary, all of the evidence leads to the inescapable conclusion that C & K turned over to DEI all of the work on the platform. Further, with reference to the condition of the platform, any repairs to the platform making the platform comply with the United States Geological Survey regulations and removing all of the oil out of the tanks on the platform, the evidence is clear that C & K turned over to DEI responsibility and actual conduct of all of these matters and this type of work. (*See* the written well service agreement paragraphs I(3) and VII attached to this Memorandum and Order as Appendix II.) In connection with the work that was being performed at the time of the casualty, DEI and its subcontractor Chapman were performing the only work on the platform and Dearborn was supplying the only ancillary service required for work on the platform. As pointed out above, the indemnity agreement contained in the well servicing agreement is broken down into three distinct parts. A reasonable interpretation of this indemnity agreement results in the conclusion that it intended to and does indemnify C & K, even in light of this court's finding of C & K's own liability on the basis that violations of the safety rules constituted negligence *per se*, resulting in the injuries to and deaths of the persons involved, thereby imposing strict liability on C & K. It also indemnifies C & K for the damage to the CARRYBACK. However, with respect to the damages to the platform and for damages occasioned by the oil washing onto the beaches, the indemnity agreement is less broad. As to such damage the indemnity agreement reads as follows: "DEI shall be liable for any injury to . . . third persons, or the public, or their property, caused by any negligent action or omission of DEI or its servants, agents or employees." With reference to this part of the indemnity agreement, it is for all practical purposes identical to that contained in

City of Beaumont v. Graham, 441 S.W.2d 829 (Tex.1969). There the Texas Supreme Court held:

"We believe the . . . provisions quoted from the contract . . . properly interpreted . . . were only intended to indemnify the contractee-City against damages or claims resulting solely from acts or conduct of Texas Tower. The provision . . stipulates that indemnity is to be against claims for injuries or damages sustained '*on account of any negligent act or fault* of CONTRACTOR * * *' . . . . The provision . . . limits the contractor's indemnification obligation to claims and damages 'arising out of *his acts* in connection with the construction of the said improvements, or *occasioned by said contractor,* his agents, servants, or employees.' We agree with the conclusion of the court of civil appeals that the language used in the instant contract does not evidence an intention of the parties that Texas Tower should indemnify City for the consequences of its own negligent conduct, or for the consequences of the joint negligence of the parties, or for the consequences of the negligent conduct of City and the non-negligent conduct of Texas Tower. Cf. Humble Oil & Ref. Co. v. Wilson, 339 S.W.2d 954 (Tex.Civ.App.—Waco, 1960, writ ref'd, n.r.e.); Westinghouse Electric Corp. v. Childs-Bellows, 352 S.W.2d 806 (Tex.Civ.App.—Ft. Worth, 1962, writ ref'd)."

DEI must also respond for the subcontractor indemnity clause because it breached its contractual agreement with C & K by not complying with the requirement of obtaining an indemnity agreement from the subcontractor, Chapman. The duty established by the contract reads as follows:

"In the event DEI engages any subcontractor for work on the above-described facilities, DEI shall obtain a written agreement with such sub-contractor by which such sub-contractor shall agree to be responsible for, and to indemnify Zapata-C & K against,

any and all liability for injuries and damage to such sub-contractor and its employees and agents, incident to or resulting from the operations of, or services performed by, such sub-contractor on said facilities."

## INDEMNITY BETWEEN JOINT TORTFEASORS

The inapplicability of any indemnity recovery between DEI and Chapman brings the theory of contribution into play between these parties as well as C & K. Hodges, Contribution and Indemnity Among Tortfeasors, 26 Texas L. Rev. 150 (1947). The applicable Texas state statute is Vernon's Tex.Rev.Civ. Stat.Ann. art. 2212 (1925):

"Any person against whom, with one or more others, a judgment is rendered in any suit on an action arising out of, or based on tort, except in causes wherein the right of contribution or of indemnity, or of recovery, over, by and between the defendants is given by statute or exists under the common law, shall, upon payment of said judgment, have a right of action against his co-defendant or co-defendants and may recover from each a sum equal to the proportion of all of the defendants named in said judgment rendered to the whole amount of said judgment. If any of said persons co-defendant be insolvent, then recovery may be had in proportion as such defendant or defendants are not insolvent; and the right of recovery over against such insolvent defendant or defendants in judgment shall exist in favor of each defendant in judgment in proportion as he has been caused to pay by reason of such insolvency."

The test for determining the right of one tortfeasor to recover indemnity from a co-tortfeasor was stated by the Texas Supreme Court in Austin Road Co. v. Pope, 147 Tex. 430, 435, 216 S.W.2d 563, 565 (1949), as follows:

"In order to determine whether the loss should be shifted from one tort-feasor to another the proper approach is to consider the one seeking indemnity as though, he were a plaintiff suing the other in tort, and then determine whether such a one as plaintiff, though guilty of a wrong against a third person, is nevertheless entitled to recover against his co-tortfeasor. * * *

"Consequently, as between themselves, either tortfeasor here involved may recover full indemnity against his co-tortfeasor if it appears that he has violated no duty toward him. On the contrary, if the tortfeasors are in pari delicto, the statute requires that each must bear his proportionate part of the burden." [citing cases]

*See also* Brown & Root, Inc. v. United States, 198 F.2d 138 (5 Cir. 1952); Humble Oil & Refining Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995 (1949); Strakos v. Gehring, 360 S.W.2d 787 (Tex.1962); Gulf, Colorado & Santa Fe Ry. Co. v. Bliss, 368 S.W.2d 594 (Tex. 1963). Since DEI and Chapman violated duties owed to each other, another part of the *Austin Road Co., supra,* opinion becomes instructive:

"The negligent conduct of each was a proximate cause of the collision and the injury inflicted was by their joint and concerted action. The act of neither was the sole proximate cause. Both tortfeasors were present on the scene, either in person or by representatives, and each participated in the wrong. Either one or both might have prevented the wrong. Neither did. Each owed the other the same due care, and each owed the duty to exercise ordinary care for the safety of the injured party. Both violated these duties. Consequently, each was guilty of the same quality of negligence toward the injured workman. Thus they stand in pari delicto with each other and must, under the statute, share equally the burdens arising from their wrongful conduct. Texas Power & Light Co. v. Stone, Tex.Civ. App., 84 S.W.2d 738, writ refused; Dallas Ry. & Terminal Co. v. Harmon,

Tex.Civ.App., 200 S.W.2d 854, writ refused." 216 S.W.2d 563 at 565, 566.

■ DEI and Chapman each violated duties owed to each other, e. g., the failure to properly supervise and DEI's failure to warn of danger. Hence, article 2212 should be applied to the present case. Borg Warner Corp. v. White Motor Co., 344 F.2d 412 (5th Cir. 1965). C & K, DEI, and Chapman shall share in damages equally for injuries or deaths on the platform with DEI contractually indemnifying C & K. Chapman will not be indemnified. Chapman will not be held to owe a share of any recoveries awarded to any of its own employees. The only exception will be in regard to Mr. Monk's damages which will be discussed below.

## GASPARD'S CONTRIBUTORY NEGLIGENCE

■ The evidence is conclusive that the welder, Mr. Gaspard, struck the fatal arc. It is argued that Gaspard did or had reason to know of the explosive nature of the contents of the tanks. This court rejects this contention and instead concludes that Gaspard reasonably believed the tanks were safe because welding had been done on the drip pans at the base of the tanks in his presence; his immediate supervisor, the tool pusher Scanlan, had directed him to weld in place on the lines; and Gaspard had not received adequate warning as to the content of the tanks. This is in accord with Texas case law. In Heldenfels v. Montgomery, 157 S.W.2d 998 (Tex.Civ. App.—San Antonio 1942, writ dismissed), the plaintiff had received through defendant's employees the idea that the piston he was working on was safe because of its solidarity. In actuality, the piston was hollow and exploded when the plaintiff, an experienced machinist, welded on it. This court accepts this as the appropriate adoptive "federal" law to apply in this case by way of section 4(a) (2) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a) which adopted the adjacent state law as of August 7, 1953. It cannot be said that as a matter of law in Texas, Gaspard was contributorily negligent in relying upon the orders of Scanlan and the indications that the tanks were safe, although Gaspard may have realized at the time that if the tanks were loaded with oil he would be doing an extremely dangerous act subjecting himself and others to injury. The suggestion was made several times in the course of this trial that Gaspard as a reasonable welder should have checked the contents of the tanks by smelling the lines himself. Failure to check the tanks himself did not constitute contributory negligence in light of the fact that many of the crew members had been told and relied on the information that the tanks were safe. Dickerson v. Continental Oil Co., 449 F. 2d 1209 (5th Cir. 1971). It is undisputed that while the platform, at the time of the accident, had five oil storage tanks and related separation equipment no wells were connected to those tanks or into that equipment. On the contrary, the three wellheads visible were shut-in and disconnected, except for bleeding of gas from one well to supply pressure for the air tugger. While the Hydrotech men who were performing the same work as the Chapman people, before they lost their contract and Chapman was hired, may have had the knowledge that there was some oil in at least one tank, there is no reason, without evidence of an adequate warning, to impute that knowledge to Gaspard. Accordingly, Mr. Gaspard will not be barred from recovery.

Admiralty law will be applied to decide the remainder of the questions at issue.

## HIRE OF THE VESSEL

■ Mr. Williams, President of DEI and acting as an agent for C & K, telephoned Mr. Eddie Dyer, President of Dearborn Marine, to arrange for the daily transportation of the men to the platform. In the opinion of this court, the agreement reached in that conversation must be held to be an arrangement for the daily hire of a vessel to

transport passengers, namely, the employees of C & K, DEI, and Chapman, sounding in contract and not a demise of the vessel to C & K. *See* Reed v. United States, 78 U.S. 591, 11 Wall. 591, 20 L.Ed. 220 (1870). Dearborn Marine agreed to carry workmen to the C & K platform on one of their boats. The fact that the boat itself, the CARRYBACK, was not chartered is evidenced by the fact that the M/V PICTEN had a few days before the casualty been the boat in use to transport the men. The boat was not operated, controlled, or manned by C & K or its agents, DEI. Mr. Williams' agreement, which was never reduced to writing, with Mr. Dyer aso included that the ship be manned by the Dearborn-Thoroughbred group.

As the Dearborn attorney stipulated for the purposes of this lawsuit, and because of the highly dubious nature of the corporate structures of the Dearborn group, all of the corporations, subs and agents of Thoroughbred, et seq., will be considered one corporate entity. Thus, DEI nor C & K had control or management of the CARRYBACK. Accordingly, "[w]hen the vessel is not under demise charter, the owner who is then in control will be liable for damages resulting from negligence in the operation and maintenance of the ship. The vessel, herself, will, of course, be liable in rem." H. Baer, Admiralty Law of the Supreme Court, 2d ed. 317 (1969).

The reasoning behind exposing Dearborn to liability without limitation in the instant case is based upon the just rationale that the firms who supply these boats along the coast for all types of operations and through dummy corporations also man and victual the boats, should not be allowed the luxury of irresponsibility in the manner in which they supply their services. In Re Spencer Kellogg & Sons, 52 F.2d 129 (2nd Cir. 1931). These corporations attempt through an elaborate maze of paperwork to create a bareboat charter thereby avoiding the safety regulations of 46 U.S.C. § 404 and the classification of passengers for hire under 46 U.S.C. §

390(a) (4). *Cf.* United States v. The Reefer King, 90 F.Supp. 236 (W.D. Wash.1950) (distinguishable on its facts). Corporations such as DEI and C & K obviously hire the services of companies like the Dearborn group to supply safe and competent services. This reliance and duty of care to passengers and public cannot be shifted on the thin weight of paperwork alone.

## STATUTORY VIOLATIONS OF THE CARRYBACK

It is undisputed that the 01.s. CARRYBACK was a 137 gross ton, diesel driven motor utility vessel with dimensions of 86 x 22 x 10 feet. It is also stipulated that on the day of the casualty Mr. Armstrong, an unlicensed master, was piloting the CARRYBACK with Mr. Cassel as an engineer and Mr. Love aboard as a cook.

The following statute is applicable to this recitation of facts:

". . . also be required to be complied with before a certificate of inspection shall be granted, and no such vessel shall be navigated without a licensed engineer and a licensed pilot . . . All vessels of above fifteen gross tons carrying freight for hire and all vessels of above fifteen gross tons and in excess of sixty-five feet in length carrying passengers for hire, but not engaged in fishing as a regular business, propelled by gas, fluid, naphtha, or electric motors, shall be subject to all the provisions of this section relating to the inspection of hulls and boilers and requiring engineers and pilots, and for any violation of the provisions of title 52 of the Revised Statutes applicable to such vessels, or of rules or regulations lawfully established thereunder . . . " 46 U.S.C. § 404.

The CARRYBACK meets the criteria of a vessel to be regulated under this statute. Therefore, as a matter of law, the owners and master of the CARRYBACK were in violation of the statute in respect to the absence of a licensed pilot and the failure to have an unex-

pired certificate of approval on the vessel.

## UNSEAWORTHINESS

The liability of the shipowner for the incompetency of the ship's crew has had a colorful and well litigated history. Judge Learned Hand gave an enlightening account of the progression of this area of the law in Keen v. Overseas Tankship Corp., 194 F.2d 515 (2d Cir. 1952), cert. denied, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363 (1952):

"It has long been settled that the assured's warranty of his ship's seaworthiness in a maritime policy is broken if the master or the crew are not competent for their duties. The King's Bench so held in 1811, Tait v. Levi, 14 East 481 (see also Walker v. Maitland, 5 B. & Ald. 172); the Supreme Court assumed as much in 1828, McLanahan v. Universal Insurance Company, 1 Pet. 170, 183, 7 L.Ed. 98; and the same doctrine lay behind the decision in Draper v. Commercial Insurance Company, 21 N.Y. 378. Moreover, in a suit by cargo against the ship in rem, Judge Betts in The Gentleman, Olcott, 110, Fed.Cas.No.5,324, made one ground of his decree in favor of the libellant that the crew were disabled by fever when the ship broke ground; and, although Mr. Justice Nelson, Fed.Cas.No.5,323, reversed this decree upon the facts, the whole discussion presupposed that, had the crew been in fact unfit for their duty, Judge Betts would have been right. The Ninth Circuit in Re Pacific Mail S.S. Co., 130 F. 76, 69 L.R.A. 71, held the shipowner liable without limitation for the loss of passengers' lives— and for the loss of life of one member of the crew—because the inability of the officers to communicate with a Chinese crew made the crew itself unfit for their duty and the ship unseaworthy. On the other hand, with the exception of the seaman just mentioned in Re Pacific Mail S.S. Co., supra, as to whom the court suggested no distinction, in none of the decisions we have mentioned did a member of the crew recover for personal injuries. In 1903 in the often cited case of The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, the Supreme Court reviewed the law at length relating to an injured seaman's right against the owner; and held that he could not recover from the owner for injuries suffered through the negligence of another seaman, invoking the fellow servant doctrine of the common law; but it recognized that it was otherwise if his injuries arose from the unseaworthiness of the ship."

In Keen, a crew member was attacked by another crew member with a meat cleaver and the Second Circuit held that the liability for personnel was identical with that for hull and gear—i. e., in the light of Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), absolute, nondelegable, and not conditioned on fault or notice. Thereby, they reversed the district court which had instructed the jury that liability depended on whether or not the shipowner knew or ought to have known of the vicious character of the crewman.

The Supreme Court adopted Hand's reasoning in Keen in the review of a Fifth Circuit court case, seeming to equate the crew's fitness as a condition of the ship's seaworthiness. Boudoin v. Lykes Bros. Steamship Co., Inc., D.C., 112 F.Supp. 177, 5 Cir., 211 F.2d 618, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed.2d 354 (1954). The issue there was the ship's liability for one crew member assaulting and injuring another crew member. The court declared that one of the criteria for the warranty of seaworthiness rested on whether or not the member in question made the crew as a whole incompetent to "meet the contingencies of the voyage." Boudoin, supra, 348 U. S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 2d 354, 359. The Boudoin case assumes that no prior notice of the condition constituting unseaworthiness need be brought home to the shipowner. However in the instant case Dearborn and Thoroughbred knew of the fact that the

CARRYBACK itself did not possess the required safety inspection sticker and that Armstrong was not a licensed master thereby making the crew potentially incompetent "to meet the contingencies of the voyage."

 Recently, the Supreme Court again addressed itself to the question of unseaworthiness. Mr. Justice Stewart noted that the shipowner is liable for unseaworthiness as a concept wholly divorced from negligence or due care concepts and that it could be transitory. *See* Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The Fifth Circuit case Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971) involved two longshoremen in a loading operation where a fall was lowered too quickly and the plaintiff was seriously injured. The Supreme Court went on to say the following in its opinion:

"A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service." 400 U.S. 499, 91 S.Ct. 517–518.

However, the court held there was no unseaworthy condition in *Usner* summarizing in the following manner:

"In Trawler Racer, supra, there existed a condition of unseaworthiness, and we held it was error to require a finding of negligent conduct in order to hold the shipowner liable. The case before us presents the other side of the same coin. For it would be equally erroneous here, where no condition of unseaworthiness existed, to hold the shipowner liable for a third party's single and wholly unforeseeable act of negligence." 400 U.S. 500, 91 S.Ct. 518.

 Unlike the facts in *Usner*, the unseaworthy condition of the CARRYBACK was not the result of an unforeseeable negligent act of a longshoreman or third party. To the contrary, under the umbrella of the reasoning stated in *Usner, supra,* and the recent Fifth Circuit extension of that philosophy in Robinson v. Showa Kaiun K.K., 451 F.2d 688 (5th Cir. 1971), the owners of the CARRYBACK must be held liable. *Robinson, supra,* developed the theory that a "congeries" of conditions by third parties (somewhat analogous to Freeport Operators furnishing an unlicensed crew) can create an unseaworthy vessel. For even if the fire on the ship, the CARRYBACK, itself did not create an "instantaneous unseaworthy" condition, the method in which the boat was moored under the circumstances of the obvious extremely deteriorated state of the platform created an unseaworthy or dangerous condition for which the shipowners must bear the burden of placing a master in charge who did not have the competence to know to moor the boat further out from the platform. The master knew or must, in law, be charged with knowing that the platform was a deteriorated oil storage platform and that welding was being done on the platform, for he carried the equipment for the welding operations to the platform on his boat. Mr. Armstrong, the master, knew or should have known of the hazardous proximity of his boat to potential fires and possible explosion by the fact that he had, at an earlier date, helped to put out a fire on this platform during these repair operations. The positioning of any standby vessel varies with the particular circumstances, and no one specific safe practice would apparently apply in all cases. However, insofar as this court can determine, this is the first instance in which a standby vessel has been burned in an offshore platform explosion and fire catastrophe.

The fact that neither C & K nor DEI requested a mooring buoy to be installed at a safe distance from the platform does not exonerate the shipowners from failure to make such a request. The master of the CARRYBACK was supposedly the "expert" on the scene in where and how his boat should be moored. If the circumstances warranted, the master should have requested or recommended the need for a mooring buoy. The failure of the master to have the CARRYBACK moored in a position clear of the platform when not in the immediate act of picking up a workman from the platform is, as a matter of law, negligent and incompetent and was a direct cause of the crew and Monk's death. At the time of the explosion, the CARRYBACK was not in the process of taking aboard a workman. All of this is not to mention the obvious statutory insufficiency of the crew according to 46 U.S.C. § 404 and, therefore, blatant unseaworthiness of the ship. Consequently, with regard to the claims of the crewmen, the CARRYBACK was unseaworthy.

## BURDEN OF PROOF

Under the Pennsylvania Rule, the owner of the CARRYBACK has the burden of proving that the statutory violations of the CARRYBACK could not have been a cause of the casualty. The Pennsylvania v. Troop, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1873). This Rule is not diminished in its application to this case by the Fifth Circuit's holding in Compania De Maderas De Caibarien, S. A. v. The Queenston Heights, 220 F.2d 120 (5th Cir. 1955). In *The Queenston*, the violation by the one ship was so slight that justice could not require a strict application of the Pennsylvania Rule. However, in the case at bar there was more than one minor infraction, thus the "Rule" is appropriate. The CARRYBACK and her owners have failed to meet this standard of proof that the statutory violation could not have had any causal relation to the death of the men aboard the vessel. *See* Manning v. M/V "Sea Road", 417 F.2d 603 (5th Cir. 1969).

## MONK'S RECOVERY

Mr. Monk was not a crew member or one doing the traditional work of a seaman when he was aboard the CARRYBACK at the time of the explosion, fire, and his ensuing death. It may be assumed that he was on the CARRYBACK using the phone and other facilities provided there for the convenience of his work as supervisor of the platform. Accordingly, the shipowner owed Mr. Monk the duty of exercising reasonable care without any encumbrances or distinctions drawn as to the nature of his "common law status" on the boat, i. e., business invitee or licensee. The Supreme Court commented on this issue in Kermarec v. Transatlantique, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed. 2d 550 (1959):

"It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew. Leathers v. Blessing, 105 U.S. 626, 26 L.Ed. 1192; The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; The Admiral Peoples, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633. But this Court has never determined whether a different and lower standard of care is demanded if the ship's visitor is a person to whom the label 'licensee' can be attached. The issue must be decided in the performance of the Court's function in declaring the general maritime law, free from inappropriate common-law concepts. The Lottawanna (Rodd v. Heartt) (U.S.) 21 Wall, 558, 22 L.Ed. 654; The Max Morris (U.S.) supra. * * We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." 358 U.S. 632, 79 S.Ct. 410, 3 L.Ed.2d 554, 555.

A California district court elaborated on the *Kermarec* language in a case involving the ship's duty of care to a stevedore and developed the argument of duty to a business invitee in the following way:

"It is, of course, true that an occupier of premises, including a charterer in possession of a vessel, owes certain duties of care to a business invitee, especially to an independent contractor, such as a stevedore company, which comes onto the premises to perform services, 2 Harper & James, The Law of Torts, Section 27.12 (1956), including the duty not to cause injury by negligent activity, 2 Restatement of Torts, Section 341; the duty to warn of latent perils actually known to the occupier, Prosser on Torts, 453 (1955); and the duty to inspect the premises to discover dangerous conditions. 2 Restatement of Torts, Section 343. See, generally, Prosser, supra, 452-62. . . . The duty arises, not from the law of contract, but from the law of tort. It rests upon the general obligation of persons to use ordinary care, and is violated only by negligent conduct . . . ." Mickle v. The Henriette Wilhelmine Shulte, 188 F. Supp. 77, 80 (N.D.Cal.1960).

Under the theory that C & K through its agent had negotiated with Dearborn for a contract for hire of a boat to carry passengers, as this opinion discussed earlier, the Dearborn group, as owner *pro hac vice* (this term is used here because the CARRYBACK was chartered by one of the splitter Dearborn operations from the "owner" which was another splitter Dearborn operation) is held responsible for a "reasonable man" duty of care to persons on the boat. A similar conclusion would also result if the premise were fashioned that the agreement between C & K and Dearborn was a charter of the boat to C & K.

 Even applying the theory that the agreement for the CARRYBACK was a charter, the owner of the vessel or the owner *pro hac vice* (not the charterer who is not in control of the vessel) is responsible for the negligence in the navigation of the vessel. Since this hypothetical charter of the CARRYBACK would have been informal and oral, this court would have to look to standard charter agreements to determine the usual allocation of duties and responsibilities. For example, in reviewing the Government Form New York Produce Exchange time charter, appendix D, p. 287, Poor, Charter Parties and Ocean Bills of Lading (4th Ed. 1954), the text discusses the obligations of the charterer to provide and pay for such things as pilotage, towage, bunker, etc.; however, even though a pilot is provided by the charterer "nevertheless it is the owner and not the charterer who is liable for his negligence in navigating." Poor, *supra* at § 7, pp. 22, 25. *See also* Delta Engineering Corp. v. Scott, 322 F.2d 11 (5th Cir. 1963).

 As discussed above, Mr. Armstrong's mooring of the boat just prior to the accident and positioning it where he did at the time of the accident was negligent and a cause in whole or in part of the deaths of the crew members and Mr. Monk. Mr. Armstrong's negligence is imputed to the shipowners and Mr. Armstrong's employer, the Dearborn group.

 Mr. Monk's own negligence in his failure to more adequately supervise the welding on the platform will not bar his recovery of damages. *Delta Engineering, supra.* The harsh common law contributory negligence rule of barring recovery is wholly incompatible with admiralty law. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143 (1953). In the historic application of comparative negligence Mr. Monk's recovery will be reduced by 25% of the total amount of damages.

 Based on the findings of fact and conclusions of law discussed earlier in this opinion, C & K, Chapman, and the Dearborn group are held jointly and severally liable for Mr. Monk's death.

## CONTRIBUTION AMONG ALL DEFENDANTS FOR THE DAMAGES OF MONK AND THE CREW MEMBERS

 As to the three crew members Armstrong, Love, and Cassel, all the defendants C & K, DEI, Chapman, and the Dearborn group stand liable in whole or in part for the explosion, fire or unseaworthy condition of the CARRY-BACK (Dearborn's duty) resulting in the death of these three plaintiffs and consequently each will share a 25% burden of the recovery awarded to each of the crew members. Penn Tanker Co. v. United States, 310 F.Supp. 613 (S.D. Tex.1970). Because of the assignment of their cause of action executed by the heirs of Messrs. Armstrong, Love, and Cassel in favor of C & K and DEI, these two defendants will stand in the shoes of those heirs. As a result of these plaintiffs having a right to sue all the named defendants and so doing, the sharing of liability by all responsible parties as here outlined is fair and equitable without any holding on the issue of contribution among these parties. This result is in perfect accord with the Supreme Court's holding in Halcyon Lines v. Haenn Ship C. & R. Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1951), as well as falling within the philosophy of the exception carved out of the no contribution in noncollision cases rule announced by the Fifth Circuit in Horton & Horton, Inc. v. T./S. J. E. Dyer, 428 F.2d 1131 (1970), cert. den., Horton & Horton v. Vaughan Marine, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed. 2d 441 (1971). *Contra,* In Re Standard Oil Co. of Cal., 325 F.Supp. 388 (N.D.Cal.1971).

 Since there was not a demise of the vessel, there is no basis for indemnity nor contribution for the proportionate damages in favor of the shipowner, Dearborn, against C & K. D/S Ove Skou v. Hebert, 365 F.2d 341 (5th Cir. 1966).

 Under the authority of Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co., 410 F.2d 178, 186–187 (5th Cir. 1969), one tortfeasor may recover indemnity from another depending upon the nature of the negligence of each. As Judge Ainsworth ably put it in *Tri-State, supra* at 181:

"In 41 Am.Jr.2d § 20, under the caption 'Right to Indemnity of Persons Compelled to Pay for Another's Wrong,' the following is a general statement of the applicable law:

" 'Although the proposition that there can be no indemnity between joint tortfeasors is still recognized as a broad general rule, it has been said that the rule which prevents a tortfeasor from recovering from a joint tortfeasor must be viewed in light of the vast growth of negligence law which has markedly changed the characteristics of negligence actions so that legal negligence no longer embodies a concept of misbehavior, and has forced the courts to find a way to do justice within the law so that one guilty of an active or affirmative act of negligence will not escape liability, while another whose fault was only technical or passive assumes complete liability. It has been said that the right of indemnity depends on the principle that everyone is responsible for the consequences of his own wrong, and if others are compelled to pay damages that ought to have been paid by the wrongdoer, they may recover from him. In this connection it has been observed that where one does the act or creates the nuisance, and the other does not join therein, but is thereby exposed to liability and suffers damage, the rule denying contribution or indemnity between joint tortfeasors does not apply, the parties not being in pari delicto as to each other, although either may be held liable as to third persons. A right to implied indemnity among tortfeasors may arise out of a contractual or special relationship between the parties or from equitable

considerations. Accordingly, it is generally held that a person who, without fault on his own part, has compelled to pay damages is entitled to recover indemnity where as between the parties to the indemnity action, the defendant is primarily liable while the plaintiff is only secondarily liable—that is, where the plaintiff is only technically or constructively liable to the injured party, or where his liability was based on a legal or contractual relationship with the defendant. In other words, a joint tortfeasor may recover indemnity where he has only an imputed or vicarious liability for damages caused by the other tortfeasor.' "

On the facts of the case at bar, while the court concludes that C & K is liable for its failure to comply with the requisite federal safety regulations, such failure did not constitute active negligence, and in the well service agreement dated December 1, 1968, DEI contracted to follow United States Coast Guard and United States Land Management regulations and to perform their job in a workmanlike manner. Since C & K was not actively negligent and had contracted with DEI to carry out C & K's responsibilities relating to these matters, C & K is entitled to indemnity contractually and on common law principles from DEI to the extent C & K has been held liable herein to the various death and personal injury claimants. Likewise, on the facts of the case at bar DEI is primarily liable and negligent for the conduct of Messrs. Monk and Chenier in their failure to adequately supervise the platform operations; Chapman is primarily liable and negligent for Mr. Overly's and Mr. Scanlan's failure to supervise the welding work; Dearborn is primarily liable and negligent for the furnishing of an unseaworthy vessel and the negligence of its master in improperly mooring the vessel. Therefore, no indemnity arising in tort will be allowed as between these

three defendants. As previously stated, C & K is awarded indemnity on common law principles as well as in connection with its contract with DEI and, accordingly, DEI will indemnify C & K for its 25% of the damages due the crew members.

As to the death of Mr. Monk, only Chapman, Dearborn, and C & K were sued, and, thus, Mr. Monk's recovery will be apportioned 33⅓% to each of these three defendants. This holding is consonant with the decision in *Horton, supra,* and *Halcyon, supra,* because Mr. Monk unlike the insured party in *Halcyon,* was not precluded from suing and did sue Chapman, C & K, and the Dearborn group. Therefore, apportioning of the damages among these three defendants is appropriate. Mr. Monk, having received Longshoreman & Harborworker Compensation benefits, is precluded from directly suing DEI. Issues involving Mr. Monk's state compensation claims need not be resolved here. Bagrowski v. American Export Isbrandtsen Lines, Inc., 440 F.2d 502 (7th Cir. 1970).

As to the indemnity questions raised between these three joint tortfeasors (i. e., C & K, Chapman, and Dearborn), a more complex issue is presented. Again, it would ill-behoove this court to factually conclude that any one of the defendants' negligence was any the less primary than any other joint tortfeasor's; therefore, no indemnity arising in tort will be allowed with the exception of Armstrong's recovery. *See* p. 1253 of this opinion.

DEI's contractual indemnity agreeing to ". . . indemnify and hold ZAPATA–C & K harmless against any and all liability for injuries and damage to DEI and its agents and employees," will again provide the basis for DEI's indemnification of C & K. Even Justice Black's dissent in *Ryan,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, *infra,* makes it clear that such an indemnity is not violative of the protective philoso-

phy for employers written into the Longshoremen's Act:

"I agree, of course, that if the employer here had made a contract, oral or written, agreeing to hold this shipowner harmless or to indemnify the shipowner against liability for injuries to petitioner's employees caused by the shipowner's negligence in whole or in part, the contract would have been valid and indemnity could have been obtained. For the Longshoremen's Act does not forbid employers under it to make independent agreements to indemnify others." 350 U.S. 141, 76 S. Ct. 241.

Now the question arises if, on a tort indemnity theory, Dearborn should be held to indemnify DEI's indemnification of C & K for Mr. Monk's recovery. Since DEI cannot have Mr. Monk's negligence imputed to it for the purposes of determining negligence of the parties in a tort theory of indemnity, DEI's only negligence was in Mr. Chenier's failure to more adequately supervise, which would have to be and is held as secondary negligence in comparison with Dearborn's activities in causing Mr. Monk's death. The Fifth Circuit has held that the negligence of an injured employee may not be imputed to his employer so as to render the employer liable in indemnity for the injuries sustained by the employee. Drewery v. Daspit Bros. Marine Divers, Inc., 317 F.2d 425 (5th Cir. 1963); Loffland Bros. Co. v. Roberts, 386 F.2d 540 (5th Cir. 1967). Therefore, under this theory of primary and secondary negligence expounded in *Tri-State, supra,* DEI would not be held to indemnify Dearborn for Mr. Monk's death; however, since DEI is held to contractually indemnify C & K, it seems only just that Dearborn be held to indemnify DEI on a tort theory.

In the alternative, Dearborn should be held to ultimately indemnify C & K for Mr. Monk's recovery on a theory of owing the duty of a warranty of workmanlike performance. A review of recent case law convinces this court that the spirit, if not the letter, of the *Ryan* doctrine

would support, in this novel set of facts, an implied warranty of workmanlike performance from Dearborn owed to C & K as the party contracting the boat on a passenger-for-hire basis, through its agent, DEI. Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp., 349 U.S. 901, 75 S.Ct. 575, 99 L.Ed. 1239 (1955). This court recognizes the factual distinctions in the stevedore/shipowner indemnity cases, but still holds that the equity of the doctrine should be boldly extended to other types of cases. The trend of case dicta would support such an extension. *See* Whisenant v. Brewster-Bartle Co., 446 F.2d 394 (5th Cir. 1971); Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011 (5th Cir. 1969); Bue, Admiralty Law in the Fifth Circuit—A Compendium for Practitioners: 1, 4 Hous.L.Rev. 347, 410, et seq. (1966). *Whisenant, supra,* is a case based on a fact situation very similar to the instant case. A contractor, Loomis, had contracted to perform services on a submersible barge (a vessel) owned by Brewster-Bartle pursuant to a drilling contract with Texaco, Inc. On appeal, Loomis argued the trial court had erred in expanding the *Ryan* doctrine citing the past reluctance of the court in *Loffland, supra.* But this time the appellate court agreed with the trial court, stating:

"Notwithstanding these general admonitions we are convinced that the doctrine was properly analyzed in this case. The court found that (1) in contracting to perform services beneficial to the vessel, Loomis warranted to perform in a workmanlike manner; (2) Loomis' unsafe procedure and plan for 'rigging up' the vessel rendered it unseaworthy and proximately caused Whisenant's [employee of Loomis] death; (3) in rendering the vessel unseaworthy Loomis breached its implied warranty of workmanlike services and was therefore obligated under *Ryan* to indemnify the barge owner for any damages sustained as a result. Thus, given the implied warranty of workmanlike service owed

by the special contractor (Loomis) to the drilling barge, we fail to see, on the facts now before us, any reason to treat the scope and measure of recovery for its breach in a manner conceptually different from that applied to the warranty of workmanlike performance owed by the stevedore to the vessel owner in *Ryan* and Crumady v. Joachim Hendrik Fisser. Both the submersible barge owner (Brewster-Bartle) in the case at hand and the vessel owner in *Ryan* relinquished control of their vessel to the tortfeasor; yet in each case they remained absolutely liable for the condition of their vessel under the nondelegable duty to provide a seaworthy vessel. In both cases, therefore, we think it appropriate that the party whose fault caused the injury should be held responsible to indemnify the party compelled to pay an injured claimant because of its technical or vicarious liability." Whisenant, 446 F.2d at 400 (reversed and remanded on other grounds).

This warranty established a duty on the part of Dearborn to furnish a seaworthy vessel to C & K and all the third party beneficiaries of the contract for hire including Mr. Monk and to position such a seaworthy vessel in a safe location with regard to the platform during the performance of the work on the platform for the duration of the contract. Dearborn did not follow through with this implied warranty and as a direct result caused Mr. Monk's death. As well as being a cause, in whole or in part, of the crew members' deaths, this breach of warranty of furnishing a seaworthy vessel and locating it in a safe position would entitle C & K to indemnity from Dearborn. Clearly, there is as between the charterer (or contracting party here) and the shipowner a warranty of seaworthiness owed to the charterer. D/S Ove Skou v. Hebert, *supra*, 365 F.2d at 352. This court holds that the language about third-party beneficiaries not being established as to independent contractors by contracts between well

owners or lessees and other independent contractors in *Loffland, supra*, 386 F.2d at 549 is distinguishable on its facts and not controlling here.

This indemnification sounds in contract rather than tort and does not require, although it was so held, a finding of negligence on the part of Dearborn:

"Where the shipowner is liable to the employees of the stevedore company as well as its employees for failing to supply a vessel and equipment free of defects, regardless of negligence, we do not think it unfair or unwise to require the stevedore to indemnify the shipowner for damages sustained as a result of injury-producing defective equipment supplied by a stevedore in furtherance of its contractual obligations. * * * we deal here with a suit for indemnification based upon a maritime contract, governed by federal law, American Stevedores, Inc. v. Porello [, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011,] supra, in an area where rather special rules governing the obligations and liability of shipowners prevail, rules that are designed to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents. By placing the burden ultimately on the company whose default caused the injury, Reed v. The Yaka, 373 U.S. 410, 414, 83 S.Ct. 1349, 10 L.Ed.2d 448, 452, we think our decision today is in furtherance of these objectives." Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732.

These objectives are also met in the instant case even though Mr. Monk, unlike the other crew members, was not a seaman in the traditional sense.

C & K's own statutory liability for the platform's condition and ultimately the explosion and death of Mr. Monk is not within the preclusions of Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). *Weyerhaeuser* was a case involving a shipowner and stevedore com-

pany indemnity question. The case was remanded for a new trial for the jury to determine the exact nature of the shipowner's negligence, which would ultimately determine if the shipowner's own negligence would preclude him from recovery under his indemnity action against the stevedore company.

## PROPERTY DAMAGES

■ With respect to C & K's property damage claims against DEI and Chapman, C & K with the approval of DEI settled its claim against Chapman and that part of C & K's suit was dismissed. However, as to the remaining issues in this suit against DEI, the contractual arrangement between these two companies must be honored. In this respect DEI contractually assumed the obligation and responsibility to perform all the work necessary on the platform and must be held liable for such damages and expenses. C & K's negligence in failing to comply with the safety regulations does not constitute any breach of duty that C & K owed to DEI because DEI contractually assumed this responsibility as between C & K and DEI. C & K owed no duty in this respect to DEI and C & K's negligence as discussed above does not constitute a bar to a recovery by C & K against DEI for property damage to the platform and expenses incident to cleaning the beaches. Of course, C & K must give credit on such damages to the extent C & K receives any payment from the amount agreed to be paid by Chapman in settlement of property damage claims as between C & K and Chapman.

■ As to the Dearborn group's claim for property damage to the vessel, the CARRYBACK (stipulated to be $129,500) all the defendants, C & K, DEI, Chapman, and the Dearborn group itself, were responsible, as discussed above, for the chain of events and conditions that brought about the explosion, fire, and ultimate destruction of the vessel. Using a liberal application of the admiralty doctrine of comparative negligence, the Dearborn group will have its property damage recovery reduced by 25%. Since

Dearborn could and did sue all the other defendants, C & K, DEI, and Chapman will all share equally in the payment of property damages to Dearborn after the 25% reduction is made from the total recovery. *See generally, Horton, supra.* Dearborn must give credit on such damages to the extent Dearborn receives any payment from the amount agreed to be paid by Chapman in settlement of all property damage claims against it.

■ Because DEI breached the contractual agreement to obtain written indemnity agreements from all subcontractors, DEI must bear C & K's portion of the damages recoverable to Dearborn for the destruction of the CARRYBACK.

■■ As previously discussed, this catastrophe brought about the death of Captain Armstrong, CARRYBACK crew members Cassel and Love, Chapman employee welder Mr. Gaspard, and DEI supervisor Mr. Monk. The evidence reflects that Captain Armstrong's body was recovered in the sea; that Mr. Cassel's body was found in his bunk aboard the CARRYBACK; that Mr. Love's body was never found; and that the remains which were identified as those of Mr. Monk were found on the foredeck of the CARRYBACK. A careful review of the evidence relating to this catastrophe causes this court to conclude that Captain Armstrong more than likely lived long enough to jump overboard in an attempt to save himself, and, consequently, there was some period of time in the neighborhood of five to fifteen minutes during which Captain Armstrong lived and suffered extreme conscious pain and suffering. The court has concluded that an award of $25,000 to the estate and heirs of Captain Armstrong for conscious pain and suffering would be appropriate. At the same time, the court must conclude for the reasons heretofore stated that Captain Armstrong was himself guilty of acts of negligence that were a cause in whole or in part of his death and the deaths of the others aboard the CARRYBACK and the damages to the CARRYBACK. Therefore, the total sum for pain and suffering plus the recovery

established in the pretrial settlement awarded to the estate and heirs of Captain Armstrong for his death should be reduced by 25% because of such negligence. With respect to the liability for the amount of recovery by the estate and heirs of Captain Armstrong, Dearborn will be indemnified equally by Chapman, DEI, and C & K, with DEI indemnifying C & K for C & K's portion of any such amount. This is for the reason that with respect to the cause of Captain Armstrong's death his negligence was passive as compared to that of C & K, DEI, and Chapman. *See* page 1250 of this Memorandum and Order for a discussion of not imputing Armstrong's negligence to Dearborn on an indemnity issue.

 Inasmuch as Mr. Love's body was never found, this court has no alternative but to conclude that he died instantaneously and, therefore, no award will be made for any conscious pain and suffering relating to Mr. Love.

As stated above, Mr. Cassel's body was found in his bunk, and this fact leads this court to conclude that Mr. Cassel died instantaneously, more than likely through suffocation. Accordingly, no recovery will be allowed to the estate and heirs of Cassel for any conscious pain and suffering.

 Only a portion of Mr. Gaspard's body was found, and considering the fact that it was his actions in striking an arc in attempting to weld the equalizer line which set off the initial explosion, this court concludes that he was killed instantaneously and, consequently, no award will be made to the estate and heirs of Mr. Gaspard for conscious pain and suffering.

 The location of the remains which have been identified as those belonging to Mr. Monk leads this court to believe that Mr. Monk more than likely lived between five and fifteen minutes during which period of time he suffered extreme conscious pain and suffering in attempting to escape the fire aboard the CARRYBACK. The court awards to the estate and heirs of Mr. Monk for such

conscious pain and suffering the sum of $25,000. As previously pointed out, the court has concluded that Mr. Monk was himself guilty of negligence and, consequently, the amount awarded to the estate and heirs of Mr. Monk will be reduced by 25% because of his own negligent conduct.

The exact amount of recovery by each party before this court is set out in a judgment which will be prepared by the attorneys and submitted to the court for approval and entry.

As to those actions which were filed in Louisiana and consolidated in this court for trial on the liability issues, they will be remanded to the court in which they were originally filed for an assessment of damages to be recovered by the parties to those actions.

With respect to C & K's claim for damages to the platform and expenses incurred relating to cleaning the beaches, the parties have stipulated that such damages and expenses total $285,000.

Black Equipment & Supply, Inc., had some equipment on the platform that was destroyed; the parties have stipulated that the facts relating to Black can be determined in this suit at this time. The parties have agreed that the total value of the equipment lost by Black Equipment & Supply, Inc., was $31,472.62.

Hydrotech Company, the company that Chapman replaced in connection with the work on the platform, has a claim, stipulated to be $4,789.93, for property damage.

 For the reasons stated in this Memorandum and Order, C & K, DEI, and Chapman will be liable and responsible for damages suffered by Black Equipment & Supply, Inc., and Hydrotech Company. DEI will indemnify C & K for C & K's portion of such damages and both C & K and DEI giving credit in connection with such recovery to any amounts they receive out of the amount contributed by Chapman in settlement of C & K's suit against Chapman.

With respect to C & K's damages to the platform and the expenses incurred in cleaning the beaches for the reasons stated in this Memorandum and Order, DEI will be liable and responsible to C & K for such damages.

All other causes of action with concomitant pleas for contribution and/or indemnity are denied for failure to prove a duty owed to the party seeking contribution and/or indemnity coupled with freedom from negligence.

C & K will pay the fees (stipulated to be $10,738.82) established by the oral contract with Dearborn for the services of the boat and crew for the period they were actually used.

C & K will pay the $7,313.25 established as the payment owing to Chapman for services rendered to the date of the explosion. The application of Texas contributory negligence law will prevent Chapman from recovering the $6,642.17 for loss and damage to its tools on the platform.

All parties will pay their own costs and attorney's fees.

The attorneys for C & K are directed to prepare and have same approved by all other attorneys a comprehensive judgment in accordance with this Memorandum and Order which shall constitute this court's findings of fact and conclusions of law. Such comprehensive judgment shall be presented to the court for approval and entry on or before two weeks from this date.

## APPENDIX I

Written Well Service Agreement of December 1, 1968, Between C & K and DEI:

"VIII.

DEI agrees to indemnify and hold ZAPATA–C & K harmless against any and all liability for injuries and damage to DEI and its agents and employees, incident to or resulting from the operations or services to be performed by DEI hereunder. DEI shall be liable for any injury to any employees of ZAPATA–C & K, or to third persons, or the public, or their property, caused by any negligent act or omission of DEI or its servants, agents or employees. In the event DEI engages any sub-contractor for work on the above-described facilities, DEI shall obtain a written agreement with such sub-contractor by which such sub-contractor shall agree to be responsible for, and to indemnify Zapata-C & K against, any and all liability for injuries and damage to such sub-contractor and its employees and agents, incident to or resulting from the operations of, or services performed by, such sub-contractor on said facilities."

## APPENDIX II

Written Well Service Agreement of December 1, 1968, Between C & K and DEI:

"I.

(3) DEI shall take cognizance of all regulations issued by the United States Coast Guard, United States Bureau of Land Management and other regulatory authorities affecting said offshore facilities, and any future amendments and modification thereof, and shall cause said offshore facilities to be maintained and operated in accordance with such regulations (including the preparation and filing of any reports required by such regulations), or if DEI is unable to comply with such regulation, DEI shall promptly notify ZAPATA–C & K, and shall render such assistance as ZAPATA–C & K may reasonably request in order to comply with such regulations.

\* \* \* \* \* \*

"VII.

In the performance of the work and service herein contemplated, DEI shall be an independent contractor and DEI shall have authority to control and direct the performance of the details of the work or services. It is specifically understood and agreed that all persons employed by DEI in the performance of the work or service covered by this

agreement are not the employees of ZAPATA–C & K for any purposes whatsoever. DEI shall not be deemed to be the agent of ZAPATA–C & K except to the extent, and only to the extent, required for the filing of reports and other documents required under the regulations of regulatory authorities and provided herein to be prepared and filed by DEI."